**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| LOCKHEED MARTIN CORPORATION,<br><br>                    Plaintiff,<br><br>v.<br><br>HOWMET AEROSPACE INC. and RTI<br>ADVANCED FORMING, INC.,<br><br>                    Defendants. | Case No. 4:23-cv-01204-O |

**DEFENDANTS' RESPONSE AND BRIEF IN OPPOSITION
TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES .................................................................... iii

PRELIMINARY STATEMENT ............................................................... 1

FACTUAL BACKGROUND..................................................................... 4

    A.    The Parties and Their Agreement ................................................ 4

    B.    Russia's Invasion of Ukraine Causes an Unprecedented Increase in Costs for Howmet and Profits for Lockheed ........................... 7

    C.    Lockheed Refuses to Agree to Commercially Reasonable Terms ................................................ 8

    D.    Howmet Modifies Prices with Qualified Suppliers Pursuant to Separate Contracts ................................................ 9

    E.    Howmet Continues to Engage in Good Faith Negotiations with Lockheed ................................................ 10

STANDARD OF REVIEW .................................................................... 11

ARGUMENT ......................................................................................... 12

  I.    Lockheed Fails to Establish that Imminent, Irreparable Harm Will Result if a TRO Is Not Granted ................................................ 12

    A.    Lockheed Has Not Substantiated Its Vague Claims of Irreparable Harm ................................................ 12

    B.    Lockheed Can Avoid Any Purported Irreparable Harm by Paying the Fair Market Price Adjustments and Seeking Damages ................................................ 16

    C.    There Is No Emergency, and Lockheed Failed to Pursue Alternative Remedies ................................................ 19

  II.    Lockheed Fails to Establish a Substantial Likelihood of Success on the Merits ................................................ 20

    A.    Lockheed Does Not Have Standing to Seek Specific Performance of Any Howmet Purchase Order ........................... 20

**Page**

    B.    Lockheed Has Not Demonstrated Violations of the Defense
          Production Act ............................................................................ 23

III.    Lockheed Has Not Shown That The Balance of Harms and
       Public Interest Weigh in Favor of a TRO ........................................ 24

CONCLUSION.............................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### <u>Rules and Statutes</u>

50 U.S.C. § 4513 ..................................................................................... 23

Fed. R. Civ. P. 65 ................................................................................... 25

Tex. Bus. & Com. Code Ann. § 1.304 .................................................... 23

Tex. Bus. & Com. Code Ann. § 2.615 .................................................... 22, 23

Texas U.C.C. § 1.304, Section 1.304 ..................................................... 23

15 C.F.R. § 700.12 ................................................................................. 23, 24

15 C.F.R. § 700.13(c)(1) ........................................................................ 24

15 C.F.R. § 700.50 ................................................................................. 4, 19

15 C.F.R. §700.53 .................................................................................. 4

15 C.F.R. § 700.54 ................................................................................. 20

15 C.F.R. § 700.57 ................................................................................. 24

15 C.F.R. § 700.92 ................................................................................. 24

### <u>Cases</u>

*Arch Chem., Inc. v. United States,*
64 Fed. Cl. 380 (2005) ........................................................................... 23

*Battelle Energy All., LLC v. Southfork Sec., Inc.,*
No. 413-cv-00442-BLW, 2013 WL 5637747 (D. Idaho Oct. 15, 2013) ............................ 18

*BL Rest. Franchises LLC v. 510 Park Inc.,*
No. 3:18-cv-0971-B, 2018 WL 2363606 (N.D. Tex. May 24, 2018) ................................. 20,21

*Bluefield Water Ass'n, Inc. v. City of Starkville,*
577 F.3d 250 (5th Cir. 2009) .................................................................. 12

**Page(s)**

*BNSF Ry. Co. v. Panhandle N. R.R. LLC*,
No. 4:16-cv-1061-O, 2016 WL 10827703
(N.D. Tex. Dec. 30, 2016) (O'Connor, J.) ............................................................ 17

*CyberX Grp., LLC v. Pearson*,
No. 3:20-cv-2501-B, 2021 WL 1966813 (N.D. Tex. May 17, 2021) ................................ 15,16

*Dennis Melancon, Inc. v. City of New Orleans*,
703 F.3d 262 (5th Cir. 2012) ............................................................................. 16

*Dieomatic, Inc. v. Gen. Aluminum Mfg. LLC*,
No. 1:23-cv-522, 2023 WL 5804426 (W.D. Mich. Aug. 3, 2023) ................................... 17

*Doe v. Tex. Christian Univ.*,
601 F. Supp. 3d 78 (N.D. Tex. 2022) .................................................................... 18

*Emery v. Sun Cupid Tech. (HK) Ltd.*,
No. 320-cv-3519-L, 2020 WL 10181571 (N.D. Tex. Dec. 1, 2020) ................................. 18

*EMR (USA Holdings) Inc. v. Allen*,
No. 3:23-cv-1995-L, 2023 WL 7272466 (N.D. Tex. Sept. 18, 2023) ............................... 11

*Equibrand Corp. v. Reinsman Equestrian Products, Inc.*,
No. 307-cv-0536-P, 2007 WL 1461393 (N.D. Tex. May 17, 2007) ................................ 18

*Fischer Am., Inc. v. PM Plastics Ltd.*,
No. 14-11269, 2014 WL 12573973 (E.D. Mich. Mar. 28, 2014) .................................... 19

*Fisher v. Halliburton*,
696 F. Supp. 2d 710 (S.D. Tex. 2010) .................................................................. 23

*Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*,
982 F.3d 280 (5th Cir. 2020)............................................................................. 11

*Hartman Income REIT Mgmt. v. Summer Energy, LLC*,
No. 14-22-00469-cv, 2023 WL 8263647 (Tex. App.—Houston
[14th Dist.] Nov. 30, 2023, no pet. h.) ................................................................. 23

*Hill v. Chester White Record Ass'n*,
No. 5:21-cv-274-M-BQ, 2021 WL 5446511 (N.D. Tex. Nov. 18, 2021)........................... 24

*Holland Am. Ins. Co. v. Succession of Roy*,
777 F.2d 992 (5th Cir. 1985) ............................................................................. 13

-iv-

**Page(s)**

*i3 Microsystems, Inc. v. Charles Stark Draper Lab'y, Inc.*,
No. 8:22-cv-1861-SDM-TGW, 2022 WL 18927172
(M.D. Fla. Nov. 17, 2022) ................................................................ 15, 20

*Janvey v. Alguire*,
647 F.3d 585 (5th Cir. 2011) ........................................................... 18

*Karaha Bodas Co. v. Perusahaan Pertambangan
Minyak Dan Gas Bumi Negara*,
335 F.3d 357 (5th Cir. 2003) ........................................................... 11

*Landmark Am. Ins. Co. v. Millennium Realty Inv'rs*,
LLC, No. 4:20-cv-01361-O, 2020 WL 9175055
(N.D. Tex. Dec. 30, 2020) (O'Connor, J.) ...................................... 17

*Precision Instrument Mfg. Co v. Auto. Maint. Mach. Co.*,
65 S. Ct. 993 (1945) ......................................................................... 25

*Radius Bank v. Stafford Transp. of La., Inc.*,
No. 3:20-cv-0591-B, 2020 WL 1288904 (N.D. Tex. Mar. 18, 2020) ................................ 12

*Reg'l Props., Inc. v. Fin. & Real Estate Consulting Co.*,
752 F.2d 178 (5th Cir. 1985) ........................................................... 25

*Schlotzsky's, Ltd. v. Sterling Purchasing & Nat'l Distrib. Co.*,
No. A-05- CA-195SS, 2006 WL 2265527 (W.D. Tex. May 24, 2006) ............................... 25

*Shintech Inc. v. Olin Corp.*,
No. 3:23-cv-112, 2023 WL 4985720 (S.D. Tex. May 18, 2023) ........................................ 17

*Snecma v. Turbine Engine Components Techs. Corp.*,
531 F. Supp. 2d 354 (N.D.N.Y. 2008) ............................................ 19

*Tex. Health & Hum. Servs. Comm'n v. United States*,
166 F. Supp. 3d 706 (N.D. Tex. 2016) ............................................ 14

*Tex. Marine & Brokerage, Inc. v. Bennington Marine, LLC*,
No. 1:12-cv-397, 2012 WL 12888827 (E.D. Tex. Oct. 17, 2012) ................................. 14

*Thomson v. Espey Huston & Assocs., Inc.*,
899 S.W.2d 415 (Tex. App.—Austin 1995, no writ) ......................... 21

*United States v. Fluitt*,
No. 22-30316, 2022 WL 3098734 (5th Cir. Aug. 4, 2022) ................. 12, 13

Defendants Howmet Aerospace Inc. and RTI Advanced Forming, Inc. ("Howmet" and together with Howmet Aerospace Inc., "Defendants") respectfully submit this memorandum of law in opposition to the motion for a temporary restraining order (the "TRO Motion" or the "Motion") filed by plaintiff Lockheed Martin Corporation ("Lockheed" or "Plaintiff"). As explained below, Lockheed has shown no basis for this Court to grant the extraordinary TRO it seeks for a contrived "emergency" that its own conduct created, and for which it has multiple adequate remedies at law.

## PRELIMINARY STATEMENT

For over 20 years, Howmet has been a proud and dedicated supplier of the F-35 Joint Strike Fighter program (the "F-35 Program").[1]  Howmet supplies titanium mill products to 65 non-parties (the "Qualified Suppliers") under separately negotiated agreements, to which Lockheed is not a party.  Qualified Suppliers, in turn, use these titanium mill products to manufacture components for Lockheed, which was awarded the prime contract for the $1.7 trillion[2] F-35 Program in 2001.  Lockheed filed this lawsuit in the middle of ongoing negotiations with Howmet over pricing for these products, negotiations that were prompted by the unforeseeable and unprecedented spike in titanium prices following Russia's invasion of Ukraine in February 2022 and Lockheed and the Qualified Suppliers' failure to provide Howmet with revert (titanium scrap that is re-used) as contractually required.

Contrary to Lockheed's cavalier invocation of "national security interests," Lockheed is seeking a TRO for one cynical reason:  *profits*.  Worried about the possibility it might have to

---

[1] Exhibits 1 through 1-1-16 are the Declaration of Sam Stiller and attached Exhibits.  Exhibit 2 is the Declaration of Mark E. McDonald.  Exhibits 3-18 are additional Exhibits supporting Defendants' Response.
[2] *See* "Lockheed Martin's $1.7 trillion F-35 fighter jet is 10 years late and 80% over budget—and it could be one of the Pentagon's biggest success stories," Yahoo! Finance, (Aug. 2, 2023), https://finance.yahoo.com/news/lockheed-martin-1-7-trillion-100000423 html.

absorb some of the increased titanium costs (which Howmet alone has absorbed for more than a year for the benefit of Lockheed and the F-35 Program), Lockheed wants to prevent Howmet from exercising its rights—under the Qualified Supplier contracts to which Lockheed is not a party—to make fair market price adjustments on future shipments to Qualified Suppliers (to which 13 Qualified Suppliers have already agreed, although at the time of this filing one has already since reneged because of Lockheed's interference) and gain tactical leverage in these ongoing price discussions with Howmet.  Lockheed's machinations must be rejected for what they are:  an attempt to gain leverage in a business deal.

To be clear, there is no emergency here, no threat to national security and no circumstance that would justify the extraordinary relief that Lockheed is seeking from this Court. First, Lockheed offers no competent evidence that any delay in the supply of titanium mill products by Howmet to any of its Qualified Suppliers during this dispute has caused, or will cause, a delay in Lockheed's delivery of F-35 fighters or otherwise jeopardize the F-35 Program. Contrary to Lockheed's conclusory assertions built on hearsay and speculation of "ripple" effects through its supply chain, Lockheed has told Howmet that it has substantial **surplus** titanium supplies because of its earlier purchases and widely reported delays in the delivery of F-35s for reasons publicly known to be completely unrelated to Howmet.

Second, Lockheed itself can readily and immediately fix the unsubstantiated supply chain (and purported national security) issues it complains about *by simply agreeing to cover a fair market price adjustment* for its Qualified Suppliers (or directing its Qualified Suppliers to do so), even if it (or the Qualified Suppliers) want to do so under protest and later seek money damages for any difference.  The burden on Lockheed would be negligible.  Given current volume expectations, the price difference amounts to approximately $17 million in aggregate

over 2024 (the last year remaining under the contract) if Qualified Suppliers buy their full projected volume, which may decrease due to Lockheed's pre-existing F-35 delivery challenges. That amounts to, at most, less than 0.025% of Lockheed's net sales for 2022.  Nonetheless, Lockheed has refused Howmet's multiple offers to continue to supply titanium to Qualified Suppliers at fair market adjusted prices during the pendency of this litigation and filed this "emergency" motion based upon an exigency of its own making.

Third, any supposed "emergency" was not recently foisted upon Lockheed, as Lockheed misleadingly suggests.  Since at least mid-2022, Howmet has continually kept Lockheed apprised of severe titanium supply issues principally caused by Russia's invasion of Ukraine and the failure of Lockheed and Qualified Suppliers to return scrap "revert" as they were contractually required to do.  These issues resulted in costs skyrocketing more than 80% above Howmet's baseline in 2018 for the F-35 Program, costs which Howmet alone has shouldered. For close to 18 months, Howmet has discussed with Lockheed, and exhaustively documented, the need for a fair market price adjustment to reflect these unanticipated new market realities. Yet over this period, despite repeatedly acknowledging the unforeseen challenges and repeatedly promising to help, Lockheed left Howmet alone to shoulder the burden of paying severely inflated prices.  By the end of 2024, the aggregate price inflation suffered by Howmet is expected to exceed *$58 million*.  Lockheed cannot now complain that it was somehow surprised or needed more time to consider Howmet's reasonable demands.

Lastly, Lockheed's repeated claims that Howmet's supposed violations of the Defense Production Act, 50 U.S.C. § 4501-4568 ("DPA"), justify a TRO are meritless.  Even if it had shown a likelihood of success on these claims (it has not), that does not make this an appropriate case for the extraordinary intervention sought by Lockheed in this commercial dispute.  The

-3-

Defense Priorities and Allocations System ("DPAS") regulations make clear that the U.S. Government—the only party with standing to enforce those regulations—will not get involved in a private price dispute, which is what this case is really about.  Lockheed fails to inform the Court that if it truly believed Howmet was violating the DPAS regulations, Lockheed's remedy under those regulations would be to submit a "timely request" for assistance to the relevant government agency with enough time for it to "effect a meaningful resolution of the problem." 15 C.F.R. §§ 700.50, 700.53 (2014).  There is no evidence Lockheed sought such assistance from the Government.  Instead, Lockheed rushed to the Court, seeking unwarranted intervention.

On this record, Lockheed has failed to demonstrate irreparable harm, which is the *sine qua non* of injunctive relief.  For any one of these reasons alone, and the additional reasons discussed below, Lockheed's Motion should be denied.

## FACTUAL BACKGROUND

### A.     The Parties and Their Agreement

Howmet is an American aerospace engineering company that produces titanium parts and other components for aerospace and transportation projects.  Howmet entered into a Master Purchase Order on July 1, 2002 with Lockheed to supply titanium mill products (*i.e.,* titanium plate, sheet, bar, billet and ingot) for the F-35 Program (the "MPO"). App. 3, Declaration of Sam Stiller ("Stiller Decl.")  ¶ 3; Lockheed Martin Complaint ("Compl.") ¶ 11, ECF No. 1.  The MPO between Howmet and Lockheed was amended on December 3, 2018 and expires on December 31, 2024.  Stiller Decl. ¶ 6, 20(c); MPO.

Lockheed is one of the world's largest aerospace and security companies with $65.98 billion in annual net sales in 2022 and a market cap of over $111 billion.[3]  Lockheed contracted

---

[3] *See* Lockheed Martin Corporation, Annual Report (Form 10-K) at 28 (Jan. 26, 2023); Lockheed Martin Corporation (LMT), Yahoo! Finance, https://finance.yahoo.com/quote/ LMT.

with the U.S. Government in 2001 to develop and manufacture F-35 Lightning II Joint Strike Fighter ("F-35") jets. *See* Compl. ¶ 4, ECF No. 1. The F-35 Program is Lockheed's largest program, representing 27% of its total net sales in 2022 (roughly $18 billion). *See id.* ¶ 8.

To make titanium mill products that are used for the F-35 Program, Howmet melts together titanium sponge (a porous form of newly mined raw titanium after the first stage of processing) and revert (re-used scrap titanium) at a ratio of approximately 51% titanium sponge to 49% revert. Stiller Decl. ¶ 4. Howmet obtains titanium sponge from suppliers in Japan, and revert from its customers or third-party distributors. Stiller Decl. ¶ 4. Titanium mill products are a fungible commodity, and Howmet has several market competitors that make such products, including U.S. companies Allegheny Technologies Inc. ("ATI") and Titanium Metals Corporation ("TiMET"). Stiller Decl. ¶ 5. And some of these competitors already provide titanium products to Lockheed.[4]

Notably, Lockheed itself only purchases a *de minimis* amount of titanium mill products from Howmet. Stiller Decl. ¶ 3. Instead, approximately 65 Qualified Suppliers—including (on an inter-company basis) a Howmet plant in Cleveland, Ohio, which makes titanium bulkheads ("Howmet CLE")—have been primarily purchasing titanium mill products from Howmet pursuant to purchase orders to which Lockheed is not a party. Stiller Decl. ¶ 3.

In the 2018 amendment to the MPO, Howmet and Lockheed agreed to fixed prices through 2022, with a limited ▆▆▆▆ inflation adjustment available for 2023. *See* MPO, cl. 7. This was consistent with Howmet's experience in the years leading up to the 2018 amendment with relatively stable titanium costs under its fixed price agreements with suppliers in Japan. Stiller Decl. ¶ 6. The parties expected minimal price volatility to continue, and did not anticipate

---

[4] *See* App. 174, Ex. 11, *Customers*, TSI Titanium, https://tsititanium.com/customers/ (last visited Dec. 7, 2023).

the extraordinary price volatility that actually occurred beginning in 2022. *Id.* ¶ 6.

The MPO requires Lockheed to provide revert scrap metal to Howmet for "up to 40% of total annual billet input weight." MPO, cl. 7. Howmet specifically bargained for this in return for agreeing to the MPO prices, as receiving revert would have allowed Howmet to better control and lower costs. Stiller Decl. ¶ 6. However, despite repeated pleas from Howmet, neither Lockheed nor its Qualified Suppliers made *any* revert available to Howmet, with the exception of Howmet's affiliate, Howmet CLE. Stiller Decl. ¶ 7. For this reason, Howmet has experienced $15.75 million in added costs over the past 5 years from sourcing (more expensive) alternatives to the revert Lockheed was obligated to provide. Stiller Decl. ¶ 9.

Despite entering into the MPO with Howmet, Lockheed did not want contractual responsibility for buying titanium from Howmet, who has separately negotiated terms with Qualified Suppliers. Stiller Decl. ¶ 3. Specifically, the MPO contains a "Right to Buy" clause under which Howmet agreed to supply "commercially reasonable quantities" of titanium mill product to Qualified Suppliers at the prices set in the MPO. MPO, cl. 18. The MPO, however, makes clear that Lockheed "shall have no obligation for payment or any matter whatsoever under [the MPO] for any sale to an Affiliated Company or Qualified Supplier." MPO, cl. 18. There are no three-way agreements executed among Lockheed, Howmet and Qualified Suppliers.

Howmet contracted with various Qualified Suppliers to provide titanium products for use in manufacturing components the suppliers sell to Lockheed. With the exception of certain suppliers who negotiated alternative terms, these Qualified Supplier contracts incorporate Howmet's standard terms and conditions, which specify that "Seller [Howmet] shall set the price and charges for each shipment of Goods at the time of each shipment." *See* App. 57, Ex. 1-7, Howmet Structure Systems – U.S. Sales Terms & Conditions of Sale.

**B.      Russia's Invasion of Ukraine Causes an Unprecedented Increase in Costs for Howmet and Profits for Lockheed**

Lockheed does not, and cannot, dispute that Russia's invasion of Ukraine and related economic sanctions have caused massive disruptions to the titanium market.

Russia and Ukraine were previously major sources of titanium supply for Western markets.  Stiller Decl. ¶ 10.  After Russia invaded Ukraine on February 24, 2022, a combination of sanctions placed on Russia, disruption of shipments from Ukraine, and unwillingness of industry leaders to buy from Russia resulted in an unforeseeable and unprecedented rise in titanium prices and gave Japanese suppliers a dominant position in the market.  Stiller Decl. ¶ 10.  Howmet's Japanese suppliers informed Howmet that they would no longer supply titanium sponge at previously agreed (and fixed) prices.  Stiller Decl. ¶ 11.  In parallel, the price of revert has also reached unprecedented highs, including as a result of COVID-19 and other unexpected factors outside of Howmet's control.  Stiller Decl. ¶ 12.

Overall, as a result of these external events, Howmet's titanium melt costs (*i.e.*, the costs of the raw materials it sources in order to produce its titanium mill products) have increased by over 83% relative to the MPO baseline.  Stiller Decl. ¶ 13.  Meanwhile, Lockheed stands to profit from a rise in demand for F-35s in the wake of Russia's invasion of Ukraine and other recent geopolitical tensions.  As the Complaint acknowledges, the F-35 Program is worth billions of dollars annually, with F-35 sales representing 27% of Lockheed's net sales in 2022, which is roughly **$18 *billion***.  *See* Compl. ¶ 8.  Lockheed itself acknowledged that it stands to earn even more from increased F-35 sales as a result of the Russia-Ukraine war.[5]

---

[5] *See* Lockheed Martin Corp., Lockheed Martin Reports Third Quarter 2023 Financial Results (Form 8-K) (Sept. 6, 2023).  In its most recent Form 10-K Annual Report, Lockheed acknowledges:  "Russia's invasion of Ukraine has significantly elevated global geopolitical tensions and security concerns.  As a result, we have received increased interest for some of our products and services."  App. 111, Ex. 3, (Lockheed Martin Corporation, Annual Report (Form 10-K) at 31 (Jan. 26, 2023)).

**C.**      **Lockheed Refuses to Agree to Commercially Reasonable Terms**

Despite standing to gain billions of additional sales from the war in Ukraine, Lockheed does not want to pay higher titanium costs caused by, among other things, that same war.  Far from springing a "Thanksgiving Day" surprise, as Lockheed essentially (and baselessly) accuses Howmet of doing in the Complaint, *see* Compl. ¶ 41, Howmet has been transparent with Lockheed about its rising costs since early 2022. Howmet repeatedly explained the financial burden placed on its titanium mill business by rising costs and Lockheed's failure to make revert available.  For months, Howmet executives implored their Lockheed counterparts on phone calls and in meetings, letters, and emails to address the supply disruptions.  Stiller Decl. ¶ 15-21.

Among other occasions, Howmet raised its concerns through:

- A June 14, 2022 letter to Lockheed—***nearly 18 months ago***—on the cost inflation experienced by Howmet as a result of disruptions to the supply chain, asking that Lockheed support Howmet to address these issues.  *Id.* ¶ 16.
- A presentation by Ramiro Gutierrez and Sam Stiller to senior Lockheed leadership on December 2, 2022 on the increase in cost of titanium sponge and Lockheed's failure to provide revert.  *Id.* ¶ 17.
- Bi-monthly meetings between high level executives of the two companies to discuss the status of the F-35 Program, and the need for price support.  *Id.* ¶ 20(a).
- Weekly communication between the project leads of both companies who discussed, among other things, the rising cost of titanium and need for price relief.  *Id.* ¶ 20(b).
- A June 29, 2023 email to Lockheed explaining that Howmet would need to review new orders of titanium sponge due to the limited revert supply and inflation.  *Id.* ¶ 20(c).
- A July 18, 2023 meeting between Howmet and Lockheed leadership to discuss the need for price increases.
- An October 2023 meeting walking Lockheed through the cost inflation for Howmet in detail.  *Id.* ¶ 20(d).
- An October 18, 2023 letter to Lockheed reiterating and explaining the need to increase prices.  *Id.* ¶ 20(f).
- An October 31, 2023 letter to Lockheed explaining that because the parties failed to secure an agreement on a sustainable supply chain moving forward, Howmet would cease shipping product to the Qualified Suppliers unless they agreed to fair market adjusted prices.  *Id.* ¶ 33.
- A November 16, 2023 letter to Lockheed reminding it that Howmet had repeatedly "implored" Lockheed to address these issues and reiterating Howmet's desire for a commercially reasonable solution.

In the meantime, Howmet alone shouldered the burden of this supply chain disruption to protect the F-35 Program.  Stiller Decl. ¶ 14.  The increased costs have put a substantial financial strain on Howmet's titanium mill production business for aerospace in the defense sector, which has become increasingly unsustainable if price relief is not achieved.

Howmet is not seeking a windfall.  While Howmet estimates it will have absorbed more than $50 million in unforeseen cost inflation by the end of next year, the fair market price adjustment Howmet requested, and which Lockheed refused, is estimated to have a total impact of $17 million for 2024.  Stiller Decl. ¶ 38.  And while Lockheed acknowledged that this is an "unprecedented" situation and said that it would render assistance to Howmet,[6] it strung Howmet along and promised support that never came.  Instead, Lockheed filed this lawsuit.

### D.  Howmet Modifies Prices with Qualified Suppliers Pursuant to Separate Contracts

Following unsuccessful efforts for over a year to reach a resolution with Lockheed,[7] Howmet finally had no choice but to engage directly with its customers in the F-35 Program, the 65 Qualified Suppliers.  On October 31, 2023, Howmet sent a letter to Qualified Suppliers giving notice of a price increase for the F-35 Program, effective November 1, 2023.  Stiller Decl. ¶ 25.[8] Howmet followed up with a letter on November 1, 2023, explaining that if they wished to cancel any existing orders due to the updated pricing, they should do so by November 9, 2023.[9]

This price adjustment was made pursuant to the terms of Howmet's agreements with Qualified Suppliers, not the MPO.  The purchase orders with Qualified Suppliers are subject to

---

[6] *See* App. 94, Ex. 1-14, Letter from Scott Dobbs to Sam Stiller (Nov. 3, 2023).
[7] The only "relief" Lockheed has offered was to suspend certain pricing rebates under the MPO, but it did so in exchange for certain additional commitments by Howmet. Stiller Decl. ¶ 21.  In any event, this stopgap measure falls far short of addressing the severe financial burden experienced by Howmet. *Id.*
[8] App. 82, Ex. 1-9, Form Letter from Sam Stiller to Customers (Oct. 31, 2023).
[9] App. 85, Ex. 1-10, Form Letter from Sam Stiller to Customers (Nov. 1, 2023).

either Howmet's standard "Terms and Conditions," or alternative terms negotiated specifically

with that Qualified Supplier.  Howmet's standard U.S. Terms and Conditions of Sale have a

pricing clause which allows Howmet to set the price for shipments at the time of each shipment:

> **Price**.  In spite of any prices previously set forth on Buyer's or Seller's
> documents, Seller shall set the price and charges for each shipment of Goods at
> the time of each shipment.  The foregoing prices do not include state or federal
> excise, sales or use taxes (if any) and all such taxes in effect or hereafter levied,
> shall be paid by Buyer.  All prices and payments are in U.S. dollars.

App. 57, Ex. 1-7 at 1.

To date, 12 Qualified Suppliers have accepted the fair market price adjustment (one more

initially agreed, but then reneged as a result of improper interference from Lockheed), and

Howmet continues to fill purchase orders from those Qualified Suppliers for the F-35 Program.

Stiller Decl. ¶ 27.  Other Qualified Suppliers have indicated that they are willing to agree to the

fair market price adjustment (acknowledging they have benefited from selling revert for higher

prices rather than returning it to Howmet as required), but only if Lockheed will give them relief

on their supply contracts with Lockheed.  Stiller Decl. ¶ 27.

### E.    Howmet Continues to Engage in Good Faith Negotiations with Lockheed

When Lockheed filed this lawsuit, Howmet was in the middle of good faith negotiations

with Lockheed regarding a commercial resolution.  On several occasions before and even after

the filing of this suit, Howmet has offered to continue shipping to Qualified Suppliers if they (or

Lockheed on their behalf) cover the fair market adjusted price (even if under protest and with the

intention to pursue damages), but Lockheed refused.  Stiller Decl. ¶ 33; Declaration of Mark E.

McDonald ("McDonald Decl.") ¶ 2-4.

In support of its TRO, Lockheed submitted two declarations of 10 and 12 paragraphs,

respectively, that claim there would be irreparable harm to its supply chain for the F-35 Program

if the TRO is not granted.  However, Lockheed fails to inform the Court that even before

Howmet's pricing adjustment, Lockheed had already announced delays in its own delivery of F-

35 fighters for this year and into 2024 for software upgrade reasons completely unrelated to

Howmet.[10]  In fact, despite promising to produce F-35 aircrafts at a rate of 156 per year,

Lockheed continuously cut its delivery target throughout 2023, and now expects to deliver only

97 planes in 2023 due to the software issues.[11]  Lockheed also told Howmet CLE, which is a

Qualified Supplier that sells aluminum and titanium bulkheads directly to Lockheed for the F-35

Program, to reduce the number of bulkheads it supplies in the next two years because Lockheed

has **surplus** inventory.  Stiller Decl. ¶ 40.

## STANDARD OF REVIEW

A party moving for a temporary restraining order must demonstrate:  (1) a substantial

likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable

injury if the injunction is not issued; (3) that the threatened injury to the movant outweighs any

damage the injunction might cause to the opponent; and (4) that the injunction will not disserve

the public interest.  *Future Proof Brands, L.L.C. v. Molson Coors Beverage Co*., 982 F.3d 280,

289 n.3 (5th Cir. 2020).  Granting a temporary restraining order is "the exception rather than the

rule."  *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335

F.3d 357, 364 (5th Cir. 2003).[12]  The Fifth Circuit has cautioned that such a remedy "should not

be granted unless the party seeking it has clearly carried the burden of persuasion on all four

---

[10] *See* App. 117, Ex. 5, 3Q23 Earnings Call Transcript; *see* App. 263, Ex. 16, Lockheed Martin Corp., Lockheed Martin Reports Third Quarter 2023 Financial Results (Form 8-K) (Sept. 6, 2023).
[11] *See Id.,* App. 117, Ex. 5, 3Q23 Earnings Call Transcript; *see* App. 263, Ex. 16, Lockheed Martin Corp., Lockheed Martin Reports Third Quarter 2023 Financial Results (Form 8-K) (Sept. 6, 2023).
[12] These elements are the same whether the plaintiff seeks a TRO or a preliminary injunction.  *EMR (USA Holdings) Inc. v. Allen*, No. 3:23-cv-1995-L, 2023 WL 7272466, at *1 (N.D. Tex. Sept. 18, 2023).

requirements." *Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009).

In contrast with prohibitive preliminary relief, "mandatory preliminary relief, . . . which goes well beyond simply maintaining the status quo [during litigation]"—like the TRO Lockheed requests in this case—"is particularly disfavored, and should not be issued unless the facts and law *clearly favor* the moving party." *Radius Bank v. Stafford Transp. of La., Inc.*, No. 3:20-cv-0591-B, 2020 WL 1288904, at *2 (N.D. Tex. Mar. 18, 2020) (emphasis added).

## ARGUMENT

### I. LOCKHEED FAILS TO ESTABLISH THAT IMMINENT, IRREPARABLE HARM WILL RESULT IF A TRO IS NOT GRANTED

Lockheed does not come close to carrying its burden to demonstrate irreparable harm for at least three reasons:  *First*, Lockheed's vague and unsubstantiated assertions about potential delays to the F-35 Program fall well short of showing substantial irreparable harm.  Not only does Lockheed rely on speculative and conclusory hearsay representations of just one (of 65) of the Qualified Suppliers, it fails to acknowledge the substantial delays already plaguing the F-35 Program for unrelated reasons, Lockheed's build-up of surplus inventory, and the availability of other qualified titanium suppliers.  *Second*, any such harm, if it even exists, would immediately vanish if Lockheed simply agreed to cover the fair market price adjustments and seek money damages in the unlikely event it prevails in this case.  *Third*, to the extent Lockheed pins its case on alleged DPAS violations by Howmet, Lockheed failed to pursue an available alternative remedy under DPAS regulations to seek assistance from the U.S. Government.

#### A. Lockheed Has Not Substantiated Its Vague Claims of Irreparable Harm

In order to establish irreparable harm for purposes of sustaining a TRO, it is not enough simply to raise the possibility or risk of irreparable injury. *United States v. Fluitt,* No. 22-30316,

2022 WL 3098734, at *2 (5th Cir. Aug. 4, 2022). "Speculative injury is not sufficient; there
must be more than an unfounded fear on the part of the applicant." *Holland Am. Ins. Co. v.
Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985); *see also id.* (noting plaintiff failed to
establish irreparable harm by submitting affidavit filled with "speculation").

Lockheed's claim of irreparable harm is based on its allegation that Howmet's failure to
ship titanium to Qualified Suppliers during the pendency of this case ███████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████. But this conclusory statement is devoid of any supporting detail. For
example, Lockheed nowhere addresses the surplus level of inventories it has stockpiled from
Qualified Suppliers. It nowhere addresses the surplus level of inventories Qualified Suppliers
have stockpiled from Howmet. Although Lockheed claims to ███████████████████████
████████████████████████████████████████████████████████████████████████████████
*id.* at 9, it nowhere explains what that is based on (███████████████████). Lockheed also
simply ignores that it recently announced that it was reducing 2023 deliveries from 156 to 97
aircrafts for entirely unrelated reasons,[13] and thus fails to explain how its conclusory assertions to
this Court are consistent with its own public statements.

Lockheed's Complaint includes pure speculation as to the supposedly dwindling
inventories of 64 of the 65 Qualified Suppliers. As to the one supplier that is identified (BAE),
Lockheed's assertions about purported lack of inventory are based on rank hearsay. In
particular, the only evidence as to the impact on BAE if it does not receive further titanium mill
shipments from Howmet comes from declarations of Lockheed's executives reciting what they

---

[13] *See* McDonald Decl., App. 117, Ex. 5, 3Q23 Earnings Call Transcript; *see* App. 263, Ex. 16, Lockheed Martin
Corp., Lockheed Martin Reports Third Quarter 2023 Financial Results (Form 8-K) (Sept. 6, 2023).

were told by BAE and a "made-for-litigation" letter from BAE dated the same day this suit was filed. *See* Declaration of Antony Kim, EFC No. 4 ("Kim Decl."); Letter from Alan Cleaver to Tony Kim (Nov. 30, 2023), ECF No. 4 at App. 054-055. While courts may consider hearsay in determining an application for a preliminary injunction, the Court must still carefully consider its probative value. *Tex. Health & Hum. Servs. Comm'n v. United States*, 166 F. Supp. 3d 706, 7141 (N.D. Tex. 2016). Here, the parade of horribles in Lockheed's declarations are filled with so many vague or unstated assumptions to be rendered virtually meaningless. For example, one Declaration states: "████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████." ECF No. 4 at App. 06 (Kim Decl. ¶ 10). ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████; nowhere is it explained whether the deliveries were already going to be delayed for unrelated reasons and whether any future delay of delivery of titanium products would add any material, incremental delay on top of these delays of F-35 aircraft that Lockheed has already announced for 2024; and so on.

Nor does Lockheed explain why it cannot source titanium elsewhere. As Mr. Stiller explains (*see, e.g.*, Stiller Decl. ¶ 5), there are multiple other suppliers of the same titanium mill products from which Lockheed could source these fungible products and those suppliers are already on-boarded by Lockheed and participate in the F-35 Program. This alone defeats irreparable harm. *See Tex. Marine & Brokerage, Inc. v. Bennington Marine, LLC*, No. 1:12-cv-397, 2012 WL 12888827, at *6 (E.D. Tex. Oct. 17, 2012), *report and recommendation adopted,*

2012 WL 12892168 (E.D. Tex. Nov. 9, 2012) (finding plaintiff "failed to show that any of the alleged harms are imminent" because product could be obtained from other manufacturers).[14] The availability of alternative suppliers is sufficient to distinguish *i3 Microsystems, Inc. v. Charles Stark Draper Lab'y, Inc.*, No. 8:22-cv-1861-SDM-TGW, 2022 WL 18927172 (M.D. Fla. Nov. 17, 2022), on which Lockheed relies. TRO Motion 12-13. Among other things, the defendant's facility in that case was "the only location in the world where the Components are capable of being produced," *id.* at *1, and it was undisputed that absent injunctive relief those components (which were critical to national security) could not be made, *id.* at *5, 9. Nothing remotely similar is alleged (much less shown) here.

Instead of alleging concrete facts and adducing evidence of irreparable injury, Lockheed makes conclusory and indefinite claims of "loss of goodwill and damage to its reputation" if a TRO is not granted and it "fail[s] to meet the delivery schedule that it agreed to in the prime contract." TRO Motion at 12. But Lockheed again fails to inform the Court that last year (before this dispute came to a head) it failed to meet the delivery schedule for approximately 50% of the planes it delivered. *See* App. 194, Ex. 12 U.S. Government Accountability Office, *F-35 Joint Strike Fighter: Cost Growth and Schedule Delays Continue* at 13 (Apr. 2022). Lockheed's reputation for managing the F-35 Program is a matter of public record and one of its own making.[15] For this reason, this case is nothing like *CyberX Grp., LLC v. Pearson,* No. 3:20-

---

[14] Notably, just months ago in August 2023, Lockheed reportedly made an order for titanium components from a U.S. based titanium developer and producer of titanium products, IperionX Limited. App. 151, Ex. 6, *IperionX to Produce Titanium Plate for Testing by Lockheed Martin*, Business Wire (Aug. 17, 2023), https://www.businesswire.com/news/home/20230817114295/en/IperionX-to-Produce-Titanium-Plate-for-Testing-by-Lockheed-Martin/).

[15] *See, e.g.*, App. 241-262, Ex. 13-15, Christopher Drew, "Chief of F-35 Jet Program Rebukes Main Contractors", The New York Times (Feb. 27, 2013), https://www.nytimes.com/2013/02/28/business/lockheed-criticized-by-f-35-jet-program-chief html?smid=url-share (F-35 Program head describing Lockheed as trying to "squeeze every nickel" out of the program and suggesting a "poor relationship" between Lockheed and the government threatened the program"); Jacqueline Klimas, "McCain: F-35 'A scandal and a tragedy,'" The Washington Examiner (Apr. 26. 2016), https://www.washingtonexaminer.com/mccain-f-35-a-scandal-and-a-tragedy (quoting Sen. John McCain's

cv-2501-B, 2021 WL 1966813 (N.D. Tex. May 17, 2021), another case on which Lockheed

heavily relies.  In that wrongful competition case, the court catalogued detailed evidence

submitted by the movant, which included four different declarations and over 40 exhibits

comprising hundreds of pages of emails, correspondence, forensic analysis, invoices, and other

evidence, to explain why in the absence of injunctive relief it would likely suffer loss of goodwill

that would be difficult to quantify, noting the "rebuttable presumption" of irreparable injury from

ongoing wrongful competition.  *Id.* at *11.  Lockheed points to no such applicable presumption,

nor any detailed evidence, here.

### B.  Lockheed Can Avoid Any Purported Irreparable Harm by Paying the Fair Market Price Adjustments and Seeking Damages

Even if Lockheed had submitted concrete evidence of imminent irreparable harm (which

it has not), any such harm is entirely avoidable even without the extraordinary TRO it seeks.

Shortly after this suit was filed, Howmet offered to continue shipping during the pendency of this

suit if Lockheed agrees to cover the fair market price adjustments, without prejudice to any

party's claim for damages.  McDonald Decl. ¶ 2.  Even if Lockheed wants to argue that Howmet

is not entitled to such fair market price adjustments (which Howmet disputes), Lockheed has an

adequate remedy at law for such claim, *i.e*., money damages.  *See Dennis Melancon, Inc. v. City

of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) ("It is . . . well-established that an injury is

irreparable only if it cannot be undone through monetary remedies." (quotations omitted)).

While that offer remains open, to date Lockheed has refused.

---

concern over Lockheed's "record of performance" as "a scandal and a tragedy with respect to cost, schedule and performance"); Valerie Insinna, "Inside America's Dysfunctional Trillion-Dollar Fighter-Jet Program", The New York Times (Aug. 21, 2019), https://www nytimes.com/2019/08/21/magazine/f35-joint-strike-fighter-program html (F-35 program head describing that the "relationship with Lockheed was the worst arrangement he had ever seen between the Pentagon and a defense contractor").

As Your Honor and many other courts have held, there can be no showing of irreparable

harm if the party seeking injunctive relief has the ability to get continued performance of a

contract by paying a price adjustment to its counterparty subject to its right to claim damages.

For example, in *BNSF Ry. Co. v. Panhandle N. R.R. LLC*, No. 4:16-cv-1061-O, 2016 WL

10827703, at *2 (N.D. Tex. Dec. 30, 2016) (O'Connor, J.), this Court held there was no

irreparable harm justifying a TRO because even if, "in order to meet its contracts, [the plaintiff]

has to adjust its charge to customers to adjust for [defendant's] increased charges, this is an

injury that could be calculated and compensated monetarily."[16]

The Court should reach the same result here.  Howmet remains ready, willing, and able to

supply titanium products to Qualified Suppliers at fair market adjusted prices which, at most,

would result in a $17 million aggregate increase in cost for Lockheed relative to a multi-billion

dollar annual budget for the F-35 Program, if the Qualified Suppliers actually fill their forecasted

volumes with Howmet in full.  Lockheed has not demonstrated its inability to pay this relatively

modest amount.  While it may (slightly) reduce Lockheed's profits, paying this amount would

not remotely put any substantial financial strain on Lockheed.  In fact, as described above,

Lockheed expects its already substantial profits from the F-35 Program to increase even further

from global demand for F-35s following Russia's invasion of Ukraine.  In any event, the amount

of such damages (even assuming Lockheed could show an entitlement to them) would be easily

---

[16] *Shintech Inc. v. Olin Corp.*, No. 3:23-cv-112, 2023 WL 4985720, at *7 (S.D. Tex. May 18, 2023) (finding no
irreparable harm because "Shintech could avoid all the harms it identifies by paying Blue Cube the amount in
dispute.  If Shintech prevails at a trial on the merits, that overpayment would be recoverable as damages with
interest—an adequate remedy at law."); *Dieomatic, Inc. v. Gen. Aluminum Mfg. LLC*, No. 1:23-cv-522, 2023 WL
5804426, at *3 (W.D. Mich. Aug. 3, 2023) (no irreparable harm because "[t]he solution to [plaintiffs'] immediate
problem appears to be that [plaintiff] continue to pay the increased price under protest, which means that the supply
chain will not be disrupted, nor will [plaintiff] lose goodwill with GM [plaintiffs' end customer]."); *see also
Landmark Am. Ins. Co. v. Millennium Realty Inv'rs,* LLC, No. 4:20-cv-01361-O, 2020 WL 9175055, at *2 (N.D.
Tex. Dec. 30, 2020) (O'Connor, J.) (finding the availability of money damages through a breach-of-contract claim
was a stand-alone reason for denying preliminary injunctive relief and a TRO).

calculated—equaling any amount above the baseline prices that Lockheed claims it is not obligated to pay.

Further demonstrating that there is no irreparable harm here, 12 of the 65 Qualified Suppliers have already agreed to pay the fair market price adjustments for current and future shipments. Not only is this objective proof that such an adjustment was fair and commercially reasonable, it shows that it would be straightforward for Lockheed (which is far larger and earns far greater profits from the F-35 Program) to accept the same to cover for its Qualified Suppliers in order to allow shipments to resume, and Lockheed has made no showing that it could not then seek a price adjustment for these unprecedented and unforeseen costs from its own customer, the U.S. Government, which is well aware of the constriction of titanium supply.[17]

Remarkably, not one of the cases cited in Lockheed's Motion addresses this dispositive issue. Not one of those cases involved a party, like Lockheed here, that had the ability to avoid the irreparable harm it claimed by paying money to a creditworthy counterparty and later seeking damages.[18] Those cases therefore do not support Lockheed's demand for a TRO here. And despite Lockheed's speculative and generalized claims about loss of goodwill and reputational damage (which on their face fail to show irreparable harm), Lockheed does not explain how this

---

[17] *See, e.g.*, App. 271-72, Ex. 17, Titanium Sponge Working Group Report: Ensuring Access to Titanium Sponge in the United States, at 4-5 (Aug. 4, 2023) (finding that Russian invasion of Ukraine in 2022 has caused "upheaval in the titanium and aerospace industries" and noting U.S. titanium suppliers, including Howmet, ATI, TIMET, and Perryman, and their "growing supply chain vulnerabilities").

[18] In *Battelle Energy All., LLC v. Southfork Sec., Inc.,* No. 413-cv-00442-BLW, 2013 WL 5637747 (D. Idaho Oct. 15, 2013), the defendant threatened to disclose software it copied from plaintiff, which would disclose that software to the hackers it was designed to protect against, which is obviously very different from a case like this one, where the dispute is over price. In *Janvey v. Alguire,* 647 F.3d 585 (5th Cir. 2011) and *Emery v. Sun Cupid Tech. (HK) Ltd.*, No. 320-cv-3519-L, 2020 WL 10181571 (N.D. Tex. Dec. 1, 2020), the issue was whether the defendant would dissipate assets while the case was pending. Nothing similar is alleged here. In *Equibrand Corp. v. Reinsman Equestrian Products, Inc.,* No. 307-cv-0536-P, 2007 WL 1461393, at *5 (N.D. Tex. May 17, 2007), where the underlying issue was one of trademark infringement, this Court noted, "[i]n a trademark case, a plaintiff may show irreparable injury by establishing a substantial likelihood of confusion," which is obviously not relevant here. In *Doe v. Tex. Christian Univ.,* 601 F. Supp. 3d 78, 95 (N.D. Tex. 2022), this Court held in a case involving accusations of sexual assault that damages for reputational harm to an individual, while technically available, were "nearly impossible to measure." Here, Lockheed's damages are quantifiable and just economic, not personal.

price dispute would incrementally damage its reputation with the Government or the marketplace —especially since Lockheed decided to make this price dispute public to squeeze out every last dollar (and to try to blame Howmet for future delays that were going to happen anyway) as opposed to quietly resolving the matter as it could have done.  In any event, Lockheed could avoid any alleged harm to its goodwill and credibility that might occur if shipments are not made simply by agreeing to cover the fair market price adjustment and seeking damages later.[19]

In light of these uncontroverted facts, Lockheed offers no explanation as to why monetary damages would be inadequate or unavailable in this case.

### C.    There Is No Emergency, and Lockheed Failed to Pursue Alternative Remedies

Howmet has dutifully engaged with Lockheed on this issue for over 18 months, providing Lockheed with explanations and supporting documentation of the causes and extent of the cost inflation.  *See supra* at 3.  Lockheed thus has had ample time to reach a reasonable commercial resolution (or find another supplier), or seek relief from the appropriate governmental agency pursuant to the DPAS regulations,[20] or even to seek assistance or relief from its ultimate customer for the F-35 Program, the U.S. Government.  It did none of that.  In contrast with *i3 Microsystems, Inc.*, on which Lockheed relies, where the U.S. Navy was involved in the parties' negotiations *before* the lawsuit was filed and a naval officer submitted an affidavit in support of

---

[19] *See Snecma v. Turbine Engine Components Techs. Corp.*, 531 F. Supp. 2d 354, 358 (N.D.N.Y. 2008) (holding that, where a buyer sought a preliminary injunction against a seller who attempted to raise prices beyond those contemplated by the contract, the buyer could "avoid the alleged irreparable harm—loss of credibility and good will—by paying the higher price, and then recover monetary damages on the merits"); *Fischer Am., Inc. v. PM Plastics Ltd.*, No. 14-11269, 2014 WL 12573973, at *2 (E.D. Mich. Mar. 28, 2014) ("[T]he plaintiff is entirely in control of avoiding the cascade of horribles that it is attempting to parlay into [] an argument for irreparable harm. The dispute appears to boil down to nothing more than a disagreement over price.").

[20] 15 C.F.R. §§ 700.50 (when a problem occurs with a priority rating, "a person should immediately contact the appropriate contract administration officer for guidance or assistance," "[s]pecial priorities assistance can be provided for any reason consistent with this part, such as assisting in obtaining timely deliveries of items needed to satisfy rated orders"), 700.52 ("special priorities assistance may be provided for any reason in support of [the DPAS] regulation," but is usually provided where "[a] person is experiencing difficulty in obtaining delivery against a rated order by the required delivery date").

-19-

the requested TRO, 2022 WL 18927172, at \*5, Lockheed submits no evidence that the U.S. Government supports its position (or even that Lockheed tried to raise this issue with the U.S. Government before coming into court and seeking emergency injunctive relief).  Of course, despite accusing Howmet of violating DPAS regulations in this suit, Lockheed may have decided not to seek the Government's assistance because the DPAS regulations are clear that the U.S. Government will not get involved where the requestor is attempting to "[o]vercome a supplier's regularly established terms of sale," or to "[s]ecure a price advantage."  15 C.F.R. § 700.54 (2014).  But that is exactly what Lockheed seeks to do here and why this Court should not intervene by granting an emergency TRO.  These are quintessential cases to be resolved in an action at law for damages, and do not require the intervention of either the U.S. Government or this Court sitting in equity.

## II.    LOCKHEED FAILS TO ESTABLISH A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

"In order to receive the extraordinary relief it seeks [Lockheed] must demonstrate not just a likelihood of success on the merits but a **substantial** likelihood of success on the merits."  *BL Rest. Franchises LLC v. 510 Park Inc*., No. 3:18-cv-0971-B, 2018 WL 2363606, at \*3 (N.D. Tex. May 24, 2018) (emphasis added).  Lockheed has not shown *any* likelihood of success on the merits of its claim for specific performance of the MPO or on its claim that Howmet breached the DPAS regulations, in alleged violation of the MPO.

### A.    Lockheed Does Not Have Standing to Seek Specific Performance of Any Howmet Purchase Order

As explained above, the MPO is a "master" agreement that provides standard terms and conditions to govern sales of titanium mill products from Howmet to Lockheed.  However, Lockheed does not have any open purchase orders to Howmet, so those terms and conditions are not relevant to Lockheed's claim for specific performance in this case.

-20-

In the MPO, Lockheed specifically directed Howmet to contract with Qualified Suppliers separately: "Seller shall enter into a separate purchase order with any such . . . Qualified Supplier which desires to procure a quantity of Items[.]"  MPO, cl. 18.  Lockheed further bargained to avoid being a party to such purchase orders between Howmet and Qualified Suppliers: "Buyer shall have no obligation for payment or *any matter whatsoever* . . . for any sale to . . . [a] Qualified Supplier[.]"  *Id.* (emphasis added).  And the MPO specifically acknowledges that the terms and conditions of the purchase orders between Howmet and Qualified Suppliers will be separate from, and may not be the same as, the terms and conditions of the MPO with Lockheed.  *See id.* (saying only they should be "substantially similar").

Lockheed is not a party to the Qualified Supplier purchase orders, and their terms and conditions are not in the record.  Obviously, Lockheed does not have standing to enforce—or seek specific performance of—contracts to which it is not a party.  *Thomson v. Espey Huston & Assocs., Inc.*, 899 S.W.2d 415, 418 (Tex. App.—Austin 1995, no writ) (finding that property owner could not recover under two contracts entered into by contractor and subcontractor to help design and build structure on owner's land where owner was not party to those contracts).  Lockheed certainly cannot show a likelihood of success on a claim for specific performance of those contracts when it has not even submitted them to the Court.

Lockheed hangs its claims in this case instead on the "Right to Buy" clause under the MPO, which generally requires Howmet to provide the MPO price to Qualified Suppliers through separate purchase orders.  TRO Motion at 7.  But that clause does not govern Howmet's sales to Qualified Suppliers, which are instead governed by the separate purchase orders to which Lockheed is not a party.  At most, the MPO's "Right to Buy" clause requires Howmet to enter into separate contracts with Qualified Suppliers on terms that are "substantially similar" to

-21-

those set forth in the MPO for the sale of "commercially reasonable" quantities of titanium mill products.  MPO, cl. 18.  Howmet has done so.  Moreover, Howmet has performed its obligations under those separate contracts—certainly, Lockheed has not shown otherwise.  It has thus not shown a breach of the MPO.

*Even if* Lockheed could show that Howmet breached the MPO's "Right to Buy" provision by entering into purchase orders with Qualified Suppliers on terms and conditions that are not "substantially similar" to the terms set forth in the MPO—including, for example, the provision Lockheed repeatedly cites that "while there are disputes between the parties," Howmet should still "diligently proceed with the performance" as "directed by" Lockheed, Compl. ¶¶ 16, 35—the remedy for such breach is *not* specific performance of *other* contracts—the separate purchase orders with Qualified Suppliers.  At most, Lockheed could in theory seek money damages limited to any harm caused by any breach of the MPO (*e.g.*, to the extent Qualified Suppliers passed on any increase in costs to Lockheed).  Because Lockheed's damages are readily quantifiable for the reasons explained above, it has an adequate remedy at law and thus will be unable to show an entitlement to specific performance of any of the MPO provisions it cites in its Complaint.

In any event, any claim by Lockheed for breach of contract damages would fail for multiple reasons, including:  (i) any obligation of Howmet to supply titanium mill products at the MPO price is excused by Lockheed's multiple material breaches of the MPO, most notably its failure to provide revert to Howmet as required; (ii) Howmet's obligations are further excused by impracticability under Section 2-615 of the Texas UCC[21]; (iii) Lockheed has failed to mitigate

---

[21] The official commentary for Section 2-615 clarifies that "a severe shortage of raw materials or of supplies due to a contingency such as war, embargo, local crop failure, unforeseen shutdown of major sources of supply or the like, which either causes a marked increase in cost or altogether prevents the seller from securing supplies necessary to his performance, is within the contemplation of this section."  Tex. Bus. & Com. Code Ann. § 2.615, com. 4.  In

any damages (such as by seeking price relief from its customer, the U.S. Government, or purchasing from other suppliers); (iv) Lockheed failed to exercise good faith in response to Howmet's demonstrated need for fair market price adjustments as required by Texas U.C.C. § 1.304[22]; (v) Howmet's obligation to accept purchase orders for "commercially reasonable quantities" of titanium mill products does not require it to accept orders for millions of pounds of such products that cost more than 80% of the baseline price expectations as a result of an unexpected war and Plaintiff's own actions; and (vi) many other defenses that Howmet will assert at the appropriate time in the course of this case.

### B.    Lockheed Has Not Demonstrated Violations of the Defense Production Act

Lockheed claims that Howmet's alleged breach of the MPO somehow "includes violation of the Defense Production Act," because the MPO is a DPAS "rated order."  *See* TRO Motion at 9-10.  Even if Lockheed had standing to bring this claim, which it does not,[23] this claim is utterly without merit.  The MPO is *not* a rated order, as it does not contain a priority rating or a required delivery date, two of the four required elements of all DPAS-rated orders.[24]

---

circumstances where "excus[ing]" performance does not resolve the issue, "good faith and the reason of the present section and of the preceding one may properly be held to justify and even to require any needed delay involved in a good faith inquiry seeking a readjustment of the contract terms to meet the new conditions."  *Id.*, com. 7 (West).

[22] Section 1.304 states that "[e]very contract or duty within this title imposes an obligation of good faith in its performance and enforcement."  Tex. Bus. & Com. Code Ann. § 1.304 (West).  "[S]ection 1.304's obligation of good faith means that if a party fails 'to perform or enforce, in good faith, a specific duty or obligation under the contract,' then that party has breached the contract, or in some circumstances, loses a remedial right or power." *Hartman Income REIT Mgmt. v. Summer Energy, LLC*, No. 14-22-00469-cv, 2023 WL 8263647, at *7 (Tex. App.—Houston [14th Dist.] Nov. 30, 2023, no pet. h.).

[23] Both the DPA and its implementing regulations have penalties and remedies sections, 50 U.S.C. § 4513 and 15 C.F.R. § 700.74, respectively.  These sections empower the Government to seek criminal penalties against parties that violate the DPA and injunctions to prevent continued violations of the DPA.  They do not empower private parties like Lockheed to bring litigation based on DPA violations.

[24] *See Fisher v. Halliburton*, 696 F. Supp. 2d 710, 718 (S.D. Tex. 2010), *overturned on other grounds*, 667 F.3d 602 (5th Cir. 2012); 15 C.F.R. § 700.12(2) (2014) ("When a 'requirements contract,' . . . bearing a priority rating contains no specific delivery date or dates, but provides for the furnishing of items from time-to-time or within a stated period against specific purchase orders, . . . the purchase orders supporting such contracts . . . must specify a required delivery date or dates and are to be considered as rated as of the date of their receipt by the supplier and not as of the date of the original procurement document."); *see also Arch Chem., Inc. v. United States*, 64 Fed. Cl. 380, 398 (2005) (finding that an order under a requirements contract is not rated until the actual order is placed for a specific quantity with a required delivery date).

Lockheed has not submitted any evidence that purchase orders issued by the Qualified Suppliers are properly rated orders (*i.e.*, contain the four required elements of a DPAS-rated order).  *See* 15 C.F.R. § 700.12.  The sole Qualified Supplier mentioned in Lockheed's Motion (BAE) is a foreign company whose orders are *not* subject to the DPAS regulations.  15 C.F.R. §§ 700.57, 700.92 ("priority ratings have no legal authority outside of the United States").[25]

In any event, Howmet is entitled under the DPAS regulations to reject even rated orders if "the person placing the order is unwilling or unable to meet regularly established terms of sale or payment[.]"  15 C.F.R. § 700.13(c)(1).  That is exactly what happened here.  The only Qualified Suppliers to whom Howmet is not currently shipping are those who have refused to comply with Howmet's "regularly established terms of sale or payment."  Lockheed's claim that it is somehow a breach of the MPO for Howmet to rely on the separate terms and conditions of its sales to Qualified Suppliers is irrelevant to the DPAS issue (in addition to being wrong) because, as noted above, the MPO is not a rated order.

## III.   LOCKHEED HAS NOT SHOWN THAT THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH IN FAVOR OF A TRO

In exercising their discretion whether to grant the extraordinary relief of a temporary restraining order, courts "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief."  *Hill v. Chester White Record Ass'n*, No. 5:21-cv-274-M-BQ, 2021 WL 5446511, at *7 (N.D. Tex. Nov. 18, 2021) (quotations omitted), *report and recommendation adopted*, 2021 WL 5459762 (N.D. Tex. Nov. 21, 2021).  As a result of the war in Ukraine, Lockheed expects its sales of F-35s to increase.  By contrast, as

---

[25] As a UK entity, BAE also does not have automatic authority to place rated orders with Howmet US subsidiaries for US items; it must request such authority from the US Government.  15 C.F.R. § 700.57(b); *see also* Dep't of Defense Priorities and Allocations Manual, DoD 4400.1-M at 37 (Feb. 21, 2002), https://www.bis.doc.gov/index.php/documents/sies/497-department-of-defense-s-priorities-and-allocations-manual-dod-4400-1-m/file.

-24-

explained above, Howmet has absorbed tens of millions of dollars in cost increases caused in large part by that same event, in combination with Lockheed's failure to abide by its MPO obligations for it and its Qualified Suppliers to provide Howmet with revert.[26]  Howmet will incur even more significant losses if the TRO is granted and Howmet is forced to continue supplying titanium under the current pricing regime.  As it stands, Howmet's margins for producing titanium mill products for the defensive aerospace sector have dropped to unsustainable levels, well below Howmet's cost of capital.  *See supra* at 9.

Lockheed's claims that considerations of national security weigh in favor of granting the TRO are a red herring.  TRO Motion 14.  As explained above, Lockheed has established its own history and ongoing pattern of delays of delivering F-35 fighters for reasons completely unrelated to Howmet's supply of titanium and has a corresponding surplus of component inventory due to the delivery backlog.  Moreover, Lockheed can avoid the alleged "threat to our national security" by paying the fair market adjusted prices for its Qualified Suppliers.

## CONCLUSION

Lockheed's TRO Motion should be denied.[27]

---

[26] Indeed, Lockheed's unclean hands by continuing to breach the MPO by failing to provide or cause its Qualified Suppliers to provide Howmet with any revert during the relevant period (Stiller Decl. ¶ 7), coupled with its blatant attempts to interfere with Howmet's contractual relations with its 65 Qualified Suppliers (*id.* at ¶¶ 28-31), which has now led to one of them who agreed to the fair price adjustment to renege (Stiller Decl. ¶ 31), disqualifies it from seeking the equitable relief of a TRO from this Court.  *See Reg'l Props., Inc. v. Fin. & Real Estate Consulting Co.*, 752 F.2d 178, 183 (5th Cir. 1985) ("Under the doctrine of unclean hands, he who commits inequity is not entitled to equitable relief."); *Schlotzsky's, Ltd. v. Sterling Purchasing & Nat'l Distrib. Co.*, No. A-05- CA-195SS, 2006 WL 2265527, at *6 (W.D. Tex. May 24, 2006) (denying application for a preliminary injunction because defendant came to court with unclean hands and this doctrine, "'closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the [other side]'").  The party's conduct need not be "of such nature as to be punishable as a crime or as to justify legal proceeds of any character" but rather "[a]ny willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause."  *Precision Instrument Mfg. Co v. Auto. Maint. Mach. Co.*, 65 S. Ct. 993, 997-98 (1945).

[27] If a TRO is granted, Defendants request that Lockheed be required to post a bond of at least $17 million, which is the amount of harm Howmet expects it will suffer next year if the TRO is granted.  *See* Fed. R. Civ. P. 65.

Dated:  December 7, 2023

Respectfully submitted,


/s/ *Thomas G. Yoxall*

Thomas G. Yoxall
  Texas Bar No. 00785304
  tyoxall@lockelord.com
C. Scott Jones
  Texas Bar No. 24012922
  sjones@lockelord.com
Chase T. Cobb
  Texas Bar No. 24116208
  Chase.Cobb@lockelord.com

LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
T: (214) 740-8000

F: (214) 740-8800

*Attorneys for the Defendants*


/s/ *Victor L. Hou*

Victor L. Hou
vhou@cgsh.com
Mark E. McDonald
memcdonald@cgsh.com
Leila Mgaloblishvili
lmgaloblishvili@cgsh.com

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
T: 212-225-2000
F: 212-225-3999

*Attorneys for the Defendants*