IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| LOCKHEED MARTIN CORPORATION,<br><br>　　　　　　　　　Plaintiff,<br>v.<br><br>HOWMET AEROSPACE INC. and RTI ADVANCED FORMING, INC.,<br><br>　　　　　　　　　Defendants. | Case No. 4:23-cv-01204-O |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS
MOTION FOR A TEMPORARY RESTRAINING ORDER**

Stripped of its irrelevant (and often inaccurate) contentions,[1] Howmet's opposition offers three main arguments: (1) the titanium prices it agreed to in the Right to Buy Contract are no longer fair because the Russia-Ukraine war has impacted supply; (2) Lockheed Martin has not shown irreparable harm because it (or its suppliers) could simply pay Howmet's extra-contractual price demands and seek damages later; and (3) Howmet has not breached the Right to Buy Contract because Howmet's purchase orders with suppliers that were issued pursuant to the Contract allow Howmet to "set the price."  These arguments are incorrect, both legally and factually.

First, that Howmet, a sophisticated contractor, now wishes it had negotiated better price terms, including more favorable escalation clauses, is not a defense to a breach claim.  The truth is that the parties have frequently renegotiated and amended the terms in the Right to Buy Contract, including as recently as <u>this year</u>, when, ironically, Lockheed Martin agreed to ████████ ████████████████████████████████████████████████████

---

[1] *E.g.*, that Lockheed Martin: is a big company; profits from its F-35 contract; supposedly has a "surplus" of titanium materials; or supposedly has breached the Right to Buy Contract as well.

███████████████████████████████████████████████████████████████

█████████████████████████████████████ Ex. 3 at pp. 10-C, 10-D (emphasis added).  In other words, the parties addressed the very circumstance that Howmet now claims has resulted in "unfair" prices, and Howmet received ███████████████████ to account for it.[2]  Howmet simply wants more money than it already has received.

In that regard, the Court may have noticed that Howmet does not claim ████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████, notwithstanding its increased raw material costs. Howmet accuses Lockheed Martin of filing this action because of profits, *see* Opp. at 1; actually, it is Howmet that wants its profits to be higher than they already are.

<u>Second</u>, Howmet's assertion that Lockheed Martin cannot obtain an injunction for specific performance and instead is required to pay Howmet's $17 million demand and sue to recover the money later is legally baseless.  The Right to Buy Contract, unlike the contracts at issue in the cases Howmet cites, expressly provides that in the event of a dispute—which the parties plainly now have—Howmet is <u>required to continue to perform under the Contract terms</u>, at Lockheed Martin's demand.  *See* Ex. 3 at ¶ 12(a)(3), incorporating Ex. 4, Jan. 2013 CorpDoc2, ¶ 10(b).  The reason for that provision was and is to avoid precisely the circumstance in which Lockheed Martin now finds itself—where a subcontractor on a critical national defense program is attempting to extort a price increase ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ If Lockheed Martin is forced to allow Howmet to breach and to pay Howmet's extra-contractual prices, with its only remedy being to sue and recover damages years later, Lockheed Martin will have irreparably lost

---

[2] ████████████████████████████████████████████████████████████

2

its right to enforce this unambiguous, bargained-for provision of the Right to Buy Contract. That harm is not only irreparable, but permanent.

Howmet suggests that the harm Lockheed Martin is facing cannot be irreparable because there have been other, unrelated delays in the delivering F-35s to the government. Opp. at 11. This is a curious argument indeed—that there already have been some delays in delivery shows how important it is, to both Lockheed Martin and the government, that any further delays be avoided. It makes the harm Howmet is causing more irreparable, not less. Delays on account of genuine technical and design issues have no relationship to delays caused by a supplier that is withholding shipment only because it wants to renegotiate contract prices and make a higher profit.

Third, Howmet's claim that it has not breached the Right to Buy Contract because its purchase orders with suppliers apparently (at least in some cases) provide that Howmet "shall set the price" for each shipment is totally mistaken. The contract analysis here is straightforward: the Right to Buy Contract provides that Howmet "shall" fulfill purchase orders issued by Lockheed Martin suppliers, at the exact prices set forth in the Right to Buy Contract. Howmet thus agreed, in its contract with Lockheed Martin, that it would have no discretion to change the prices charged to suppliers that issued purchase orders pursuant to the Contract. As a result, even where individual purchase orders state that Howmet can "set the price," Howmet contractually obligated itself in the Right to Buy Contract to "set the price" at the same price stated in that Contract. Its refusal to do so is a breach of its promise to Lockheed Martin.

**ARGUMENT**

**I.    Lockheed Martin is Likely to Succeed on the Merits.**

Howmet's Opposition cannot change the core facts that demonstrate its breach of the Right to Buy Contract. Howmet does not dispute that the Right to Buy Contract is a valid contract, that it includes a clause that Howmet "shall" supply titanium materials to Qualified Suppliers of

3

Lockheed Martin at the exact prices set forth in the Contract, *see* Ex. 3 at § 18, or that it includes a disputes provision that obligates Howmet to "diligently proceed with the performance of [the] Contract as directed by LOCKHEED MARTIN" during the pendency of "any dispute," Ex. 4 at ¶ 10(b). Howmet concedes that, despite these obligations, it unilaterally—and against the direction of Lockheed Martin—███████████████████████████████████████████████████████████████████████████████. Those undisputed facts conclusively establish a breach, and none of the arguments Howmet offers can change that fact.

First, Howmet argues that the Right to Buy Contract merely "provides standard terms and conditions to govern sales of titanium mill products from Howmet to Lockheed," *see* Opp. at 20, that Howmet's agreements with Qualified Suppliers that order pursuant to the Contract permit it to demand higher prices for its materials, and that Lockheed Martin does "not have standing to enforce—or seek specific performance of—contracts to which it is not a party," *see* Opp. at 21. This argument ignores the plain language of the Right to Buy Contract. That Contract is a straightforward requirements contract, by which Howmet agreed that it "shall sell" to Lockheed Martin's Qualified Suppliers the specified titanium materials at the "price set forth in [the Right to Buy Contract]." Ex. 3 at § 18. If Howmet violates that obligation—which it admits it has—then it has breached the Contract with Lockheed Martin, regardless of whether it also has breached its own contracts with the Qualified Suppliers.[3] The specific performance Lockheed Martin seeks is performance of the Right to Buy Contract, not any other contract. That Contract, through both the right to buy provisions (§ 18) and the disputes provision (¶ 12(a)(3), incorporating Ex. 4, Jan. 2013

---

[3] Howmet quotes the portion of the Right to Buy Contract providing that Lockheed Martin is not obligated to assume payments for materials purchased by Qualified Suppliers. *See* Opp. at 21. That unremarkable provision—suppliers of course have to pay for the materials they use, and then Lockheed Martin in turn pays them for products they supply—does not alter Howmet's obligation to Lockheed Martin to charge suppliers the negotiated price set forth in the Right to Buy Contract.

CorpDoc2, ¶ 10(b)), require Howmet to supply the Qualified Suppliers at the Contract price even if there is a dispute as to terms associated with the supply. The parties thus "agreed in advance how" any "disputes would be handled." *Coalview Centralia, LLC v. Transalta Centralia Mining LLC*, 2018 WL 5619027, at *4 (W.D. Wash. Oct. 30, 2018).

Howmet tries to avoid this result by arguing that its purchase orders with Lockheed Martin's Qualified Suppliers give it the right to breach the Right to Buy Contract, because these orders (at least with some suppliers) incorporate Howmet's "Terms and Conditions," which supposedly allow Howmet to "set the price" for its shipments. *See* Opp. at 6. That is wrong.

For one, the two contracts are not at all inconsistent. In its Contract with Lockheed Martin, Howmet agreed to the exact prices it would charge Lockheed Martin's Qualified Suppliers for titanium materials. And in its own contracts with (some of) those Qualified Suppliers, Howmet provided that it would "set the price" for such materials. Thus, by virtue of its promise to Lockheed Martin, Howmet must "set the price" at the prices stated in the Right to Buy Contract. The Right to Buy Contract is clear: "[I]n no event shall a higher price for the items be charged to any . . . Qualified Supplier using the Right to Buy provisions herein." Ex. 3 at ¶ 18.

Even if that were not true, Howmet's argument ignores other plain text of the Right to Buy Contract. Paragraph 11(b) identifies the order of precedence "[i]n the event of any inconsistency" between the Right to Buy Contract and other documents that effectuate the Contract, including "Authorizing Documents issued under this MPO," which include purchase orders issued pursuant to the Contract. The top priority in the event of a conflict is the Right to Buy Contract; "Authorizing Documents" are the fourth priority. *See* Ex. 3 at ¶ 11(b). Thus, even if there were a conflict between the terms in the Right to Buy Contract and the individual agreements between Howmet and the Qualified Suppliers, the terms of the Right to Buy Contract control. *See TRC*

5

*Env't Corp. v. LVI Facility Servs., Inc.*, 2017 WL 10955954, at *6 (W.D. Tex. Sept. 26, 2017) ("In light of this provision in the Prime Contract discussing priority of the Contract Documents in the event of disagreement, the Court finds the Contract Documents are unambiguous….").

<u>Second</u>, Howmet repeatedly invokes "commercial reasonability" as its get-out-of-jail-free card—arguing that there is no breach of the Right to Buy Contract because titanium market conditions have changed so significantly that its performance is no longer commercially reasonable. *See, e.g.*, Opp. at 8, 17. Not so. That Howmet—an ably represented sophisticated global business with more than $5.5 billion in annual revenue—wants to make higher profits at the hands of the U.S. taxpayer (the ultimate payor on every one of its titanium contracts) does not mean the terms it agreed to are commercially unreasonable. It negotiated for, and agreed to, the very terms of which it now complains. That it no longer likes those terms does not excuse its performance. *See, e.g.*, *TEC Olmos, LLC v. ConocoPhillips Co.*, 555 S.W.3d 176, 183 (Tex. App. 2018) ("[A] contractual obligation cannot be avoided simply because performance has become more economically burdensome than a party anticipated." (quotation omitted)); *Philips v. McNease*, 467 S.W.3d 688, 698 (Tex. App. 2015) (holding same).

Howmet points to the ongoing conflict between Russia and Ukraine and its alleged impact on titanium markets, offering hyperbolic statements about the "unforeseeable and unprecedented spike following Russia's invasion of Ukraine in February 2022." Opp. at 1. But Howmet left out of its narrative that in February <u>2023</u>, Howmet and Lockheed Martin renegotiated the Right to Buy Contract to expressly take into account that conflict's impact on the Contract's terms. ▌

▌

▌

▌ *See* Ex. 3, at pp. 10-C, 10-D (emphasis

6

added). This amendment shows that, rather than these circumstances being "unforeseen," these sophisticated parties expressly negotiated pricing and other contract terms cognizant of the events involving Russia and Ukraine.

Third, Howmet repeatedly attempts to downplay the critical importance of the DPAS rating associated with the F-35 program. Howmet argues that Lockheed Martin does not have "standing" to enforce DPAS against Howmet, *see* Opp. at 23, but that is a red herring. Lockheed Martin is not attempting to bring any action under the Defense Production Act or DPAS; rather, the DPAS rating highlights the critical importance the U.S. government places on the timely performance of this program and its associated contracts.[4] Howmet's other assertions related to DPAS—that its unilateral decision ████████████████ is permissible because Howmet is "entitled under the DPAS regulations to reject even rated orders if 'the person placing the order is unwilling or unable to meet regularly established terms of sale or payment'"—are frankly shocking. *See* Opp. at 24. Howmet is taking the position that its extortionate demands—which breach the terms of both the Right to Buy Contract and the existing supplier-Howmet purchase orders—are part of the "regularly established terms of sale or payment." *Id.* There is no basis whatsoever for such an absurd interpretation. The notion that DPAS permits Howmet, when performing a DPAS-rated contract that is critical to U.S. national security, to ignore pricing and delivery schedules merely to enrich its bottom line is both baseless and contradicts the text and the purpose of DPAS.

Finally, Howmet—in a single paragraph near the end of its brief, without explanation or evidence—offers a laundry list of supposed defenses that excuse its breach. *See* Opp. at 22-23. Merely reciting legal theories without argument or support cannot defeat a request for injunctive relief. Indeed, that Howmet did not develop any of these theories shows the lack of merit in each.

---

[4] Lockheed Martin has reported Howmet's recent activities to the responsible government offices.

**II.     Howmet's Breaches Have Caused (and Continue to Cause) Irreparable Harm.**

Lockheed Martin provided first-hand explanations from individuals who manage the exceptionally complex F-35 supply chain of the harms that will follow ███████████ ███████████████████████████████████████████. *See* Mot. at 10-13. Lockheed Martin also explained the substantial reputational harm and loss of goodwill that it will suffer if Howmet is ███████████████████████████████. *See id.* at 12.

Howmet attempts to brush this evidence aside, labeling it "vague" and "speculative." Opp. at 12. But Lockheed Martin's declarations are very specific: its Vice-President and its Director of F-35 Supply Chain Management ████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████. *See* Ex. 1, Javanmardi Decl. ¶¶ 8-9; Ex. 2, Kim Decl. ¶¶ 9-11. Howmet does not—because it cannot—claim that these sworn statements are inaccurate. Instead, Howmet suggests that they do not establish irreparable harm ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████ Opp. at 13, 14. Both of those assertions are false.

As to ██████████, Howmet cites a statement that <u>two years ago</u>, a Lockheed Martin supplier ██████████████████████████████. *See* Dkt. 27-2, App. 15, ¶ 40. There are literally hundreds of titanium parts needed to construct an F-35 aircraft. ███████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

8

████████████████████████████████████

████████████████████████████

Howmet also argues that its conduct has not caused irreparable harm because, over the life of this first-in-class program, there have been other delays. *See* Opp. at 14. Howmet cites no case law, and there is none, to support its remarkable suggestion that the Court should countenance Howmet's willful decision to <u>cause</u> a disruption in the delivery of vital aircraft to the U.S. Defense Department merely because there have been other disruptions in the past. That there have been other delays on F-35 program for technical issues makes it all the more important that further delays are avoided, especially ones caused by a supplier trying to extort a higher price.

Finally, Howmet claims that Lockheed Martin could avoid any irreparable harm by giving in to Howmet's breach, meeting its extra-contractual price demands, and seeking damages later. To begin with, the law does not "require a litigant to sign away the farm in order to save the crops." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 n.8 (1st Cir. 1996) (rejecting argument that movant could not show irreparable harm because it need only execute a contract it was not obligated to sign); *see Huston-Tillotson Univ. v. Sprint Corp.*, 2020 WL 1695690, at *5 (W.D. Tex. Apr. 7, 2020); *VanDerStok v. Blackhawk Mf'g Grp. Inc.*, 639 F. Supp. 3d 722, 729 (N.D. Tex. 2022) (rejecting argument that movant could "avert . . . injury by simply complying" with a likely unlawful rule).[5]

---

[5] The cases on which Howmet relies are distinguishable—in each one, the plaintiff took steps or made admissions that undermined its claim of irreparable harm. *See BNSF R.R. v. Panhandle No. RR*, 2016 WL 10827703, at *2 (N.D. Tex. Dec. 30, 2016) (plaintiff admitted it could perform its customer contracts by modifying terms); *Dieomatic, Inc. v. Gen. Alum. Manuf. LLC*, 2023 WL 5804426, at *3 (W.D. Mich. Aug. 3, 2023) (finding no irreparable injury where plaintiff already began paying a higher price than contract's terms before seeking emergency relief); *Landmark Am. Ins. Co., v. Millennium Realty Invests. LLC*, 2020 WL 9175055, at *2 (Dec. 30, 2020) (finding plaintiff did not show irreparable harm "by its own admissions" that the costs could be pursued in a "breach-of-contract suit for money damages"). Also, none of these cases mirror the irreparable

9

As importantly, the Right to Buy Contract—unlike the contracts in the cases Howmet cites—<u>requires</u> Howmet to continue to "diligently perform" while a dispute is pending, "at Lockheed Martin's demand." Ex. 4, ¶ 10(b). If Howmet is permitted to continue to breach, and receive higher prices as a condition for supplying materials, then Lockheed Martin will have irreparably lost its bargained-for right to demand continued performance during a dispute.

### III.     The Balance of Hardships and Public Interest Factors Support Injunctive Relief.

Howmet offers a grab-bag of unpersuasive arguments to address the remaining two factors. It suggests the balance of hardships tips in its favor because its "margins for producing titanium mill products <u>for the defensive aerospace sector</u> have dropped to unsustainable levels." Opp. at 25 (emphasis added).[6] But Howmet's desire for higher profits is not a hardship, particularly when balanced against the impacts on U.S. national security. In a sprawling footnote, Opp. at 25 n. 26, Howmet also offers unfounded allegations that Lockheed Martin has "unclean hands" because it did not "provide or cause its Qualified Suppliers to provide Howmet with any revert during the relevant period," a meritless, made-for-litigation argument that Howmet doesn't begin explain. So too is Howmet's suggestion that Lockheed Martin has unclean hands because of "blatant attempts to interfere with Howmet's contractual relations with ▓▓▓▓▓▓▓▓▓▓▓▓▓▓." Lockheed Martin's engagement with its suppliers to protect its bargained-for rights—rights which <u>expressly</u> inure to the benefit of the Qualified Suppliers—cannot, as a matter of law, be interference. Both the balance of hardship and public interest factors overwhelmingly support Lockheed Martin.

---

injuries at issue here, including the potential impact on national security. *See, e.g.*, *Shintech Inc. v. Olin Corp.*, 2023 WL 4985720, at *6-7 (S.D. Tex. May 18, 2023) (finding, in dispute regarding vinyl chloride monomer sales, that all alleged harms could be remedied with monetary damages).

[6] Howmet's qualification speaks volumes. It supplies titanium for both the defense aerospace sector *and* the commercial aerospace sector, the latter of which is not subject to the terms Howmet negotiated in the Right to Buy Contract or the specific DPAS requirements.

Dated: December 8, 2023　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　By: /s/ Micah R. Prude
　　　　　　　　　　　　　　　　　　　　Micah R. Prude
　　　　　　　　　　　　　　　　　　　　　　State Bar No. 24051216
　　　　　　　　　　　　　　　　　　　　Sara Babineaux
　　　　　　　　　　　　　　　　　　　　　　State Bar No. 24125102

　　　　　　　　　　　　　　　　　　　　**HOLLAND & KNIGHT LLP**
　　　　　　　　　　　　　　　　　　　　One Arts Plaza
　　　　　　　　　　　　　　　　　　　　1722 Routh Street, Suite 1500
　　　　　　　　　　　　　　　　　　　　Dallas, Texas 75201
　　　　　　　　　　　　　　　　　　　　Telephone: (214) 969-1700
　　　　　　　　　　　　　　　　　　　　Facsimile: (214) 969-1751

　　　　　　　　　　　　　　　　　　　　Email: micah.prude@hklaw.com
　　　　　　　　　　　　　　　　　　　　Email: sara.babineaux@hklaw.com

　　　　　　　　　　　　　　　　　　　　Joseph G. Petrosinelli (*pro hac vice*)
　　　　　　　　　　　　　　　　　　　　Christopher J. Mandernach (*pro hac vice*)
　　　　　　　　　　　　　　　　　　　　Kimberly Broecker (*pro hac vice*)

　　　　　　　　　　　　　　　　　　　　**WILLIAMS & CONNOLLY LLP**
　　　　　　　　　　　　　　　　　　　　680 Maine Ave. S.W.
　　　　　　　　　　　　　　　　　　　　Washington, DC 20024
　　　　　　　　　　　　　　　　　　　　Telephone: (202) 434-5000
　　　　　　　　　　　　　　　　　　　　Facsimile: (202) 434-5029

　　　　　　　　　　　　　　　　　　　　Email: jpetrosinelli@wc.com
　　　　　　　　　　　　　　　　　　　　Email: cmandernach@wc.com
　　　　　　　　　　　　　　　　　　　　Email: kbroecker@wc.com

　　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff*
　　　　　　　　　　　　　　　　　　　　*Lockheed Martin Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing will be served on Defendants Howmet Aerospace Inc. and RTI Advance Forming, Inc.'s counsel via operation of the Court's CM/ECF system.

*/s/ Micah R. Prude*
MICAH R. PRUDE