**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| **LOCKHEED MARTIN CORPORATION,** § <br> § <br> Plaintiff,  § <br> § <br> v.  § <br> § <br> **HOWMET AEROSPACE INC. and RTI ADVANCED FORMING, INC.,** § <br> § <br> Defendants.  § | Civil Action No. 4:23-cv-01204-O |

## ORDER

Before the Court are Plaintiff's Motion for Temporary Restraining Order (ECF No. 3) with Memorandum in Support (ECF Nos. 4-1, 31) and Appendix (ECF No. 4-2, 32);[1] Defendants' Response (ECF Nos. 27-1, 28) and Appendix (ECF Nos. 27-2, 35);[2] and Plaintiff's Reply (ECF Nos. 36-1, 38).[3] Having reviewed the briefing and applicable law, the Court finds that a temporary restraining order ("TRO") should be and is hereby **GRANTED**. Accordingly, the Court temporarily **ORDERS** Defendants—along with their officers, agents, servants, and employees—to immediately comply with its contractual obligations in the manner set forth below. The Court sets this matter for hearing on **December 26, 2023 at 9:00 a.m**.

---

[1] Plaintiff filed its Memorandum in Support (ECF No. 4-1) and Appendix (ECF No. 4-2) under seal. Public versions of these filings are also available on the docket. *See* ECF Nos. 31–32 (containing redacted versions of Plaintiff's filings in support of its request for a TRO).

[2] Defendants filed their Response (ECF No. 27-1) and Appendix (ECF No. 27-2) under seal. Public versions of these filings are also available on the docket. *See* ECF Nos. 28, 35 (containing redacted versions of Defendants' filings in response to the request for a TRO).

[3] Plaintiff filed its Reply (ECF No. 36-1) under seal. A public version of this filing is also available on the docket. *See* ECF No. 38 (containing the redacted version of Plaintiff's reply in support of its request for a TRO).

I.   **BACKGROUND**[4]

Lockheed was awarded the prime defense contract for the United States' F-35 program. In 2002, Lockheed Martin ("Lockheed" or "Plaintiff") and RTI International Metals, Inc. ("RTI International") entered into a contract for the F-35 program, the Master Purchase Order ("MPO"). Pursuant to the MPO, RTI International agreed to supply Lockheed and its other subcontractors whatever amount of titanium products (*i.e.*, sheets, plates, bars, billets, and ingots) that those parties sought to purchase for use in constructing F-35s. The MPO was amended several times. Later amendments were executed first by RTI Advanced Forming, Inc. ("RTI") and then by Defendant Howmet Aerospace Inc. ("Howmet" or "Defendant") following Howmet's acquisition of RTI in 2020.[5] One of those amendments memorialized the parties' agreement to fixed prices from 2018 to 2022, with a limited inflation adjustment available in 2023.

The parties have performed under the MPO for over twenty years. Currently, Howmet supplies titanium to Lockheed and its sixty-five subcontractors (the "Qualified Suppliers"). When the Qualified Suppliers require titanium to manufacture components for Lockheed, they enter into separate purchase orders with Howmet pursuant to the MPO's Right to Buy Clause.[6] Under the Right to Buy clause, Howmet supplies "commercially reasonable quantities" of titanium to Qualified Suppliers at the prices set in the MPO. Although Lockheed and Howmet entered into the governing contract, the Qualified Suppliers are nonetheless responsible "for payment or any matter whatsoever," such as the return of scrap titanium scrap metal "revert" to Howmet. The Qualified Suppliers sometimes negotiate other terms not covered by the MPO or accept Howmet's standard terms and conditions.

---

[4] Unless otherwise noted, the Court's recitation of facts is taken from Defendants' Response (ECF No. 28).
[5] Howmet and RTI are referred to collectively herein as "Howmet" or "Defendants" due to the acquisition.
[6] Pl.'s App'x in Support of Pl.'s Mot. for TRO 031, ECF No. 32 (Right to Buy Clause).

Russia's invasion of Ukraine caused an unprecedented disruption to the titanium market. Both countries were previously major sources of titanium supply for Western markets. After Russia's initial invasion on February 24, 2022, a combination of sanctions placed on Russia, disruption of shipments from Ukraine, and unwillingness of industry leaders to buy from Russia resulted in the rise of titanium prices and gave Japanese suppliers a dominant position in the market. As a result, Japanese suppliers informed Howmet that they would no longer supply titanium sponge at previous price levels. In parallel, the price of revert has also reached new highs, including as a result of COVID-19 and other factors. At the same time, there has been rise in demand for Lockheed's F-35s in the wake of Russia's invasion of Ukraine and other recent geopolitical tensions. The F-35 Program is worth billions of dollars annually, with F-35 purchases representing 27% of Lockheed's net sales in 2022.

As a result of these external events, Howmet's titanium melt costs (*i.e.*, the costs of the raw materials it sources in order to produce its titanium products) significantly increased. Howmet first communicated its financial burdens to Lockheed in early 2022. The parties regularly discussed this issue via multiple meetings, phone calls, letters, and emails for more than a year. During that time, Howmet absorbed the costs of the titanium supply disruption. Eventually, Howmet requested price relief from Lockheed due to the financial strain. But following unsuccessful efforts to reach resolution with Lockheed, Howmet engaged directly with the Qualified Suppliers. On October 31, 2023, Howmet sent a letter notifying the Qualified Suppliers of the price increase effective the next day. Despite the MPO's Right to Buy Clause, Howmet justified the price adjustment based on the terms and conditions in the individual purchase orders with the Qualified Suppliers. So far, twelve of the Qualified Suppliers assented to the new price and others stated they will assent upon

Lockheed subsequently providing relief for the increased price. Howmet agreed to continuing providing titanium to the Qualified Suppliers only if they (or Lockheed on their behalf) pay the new price. Lockheed refused.

Due to the parties' ongoing pricing dispute, Lockheed initiated this lawsuit on November 30, 2023[7] and simultaneously sought a TRO.[8] Howmet responded on December 7, 2023[9] and Lockheed filed a reply on December 8, 2023.[10] The briefing is now ripe for the Court's review.

## II.   LEGAL STANDARD

Federal Rule 65 authorizes injunctive relief. FED. R. CIV. P. 65(a)–(b). The decision to grant or deny injunctive relief is committed to the district court's discretion. *See Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985). The purpose of a TRO is "to preserve the status quo until there is an opportunity to hold a hearing." 11A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2951 (3d ed.). "A [temporary restraining order] is simply a highly accelerated and temporary form of preliminary injunctive relief, which requires that the party seeking such relief establish the same four elements for obtaining a preliminary injunction." *Greer's Ranch Café v. Guzman*, 540 F.Supp.3d 638, 644–45 (N.D. Tex. 2021) (cleaned up). A court may issue a TRO if the movant demonstrates: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the balance of hardships weighs in its favor; and (4) that the issuance of the preliminary injunction will not disserve the public interest. *Daniels Health Servs., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). As the movant, it is the party seeking relief who bears the burden

---

[7] Pl.'s Compl., ECF No. 1.
[8] Pl.'s Mot. for TRO, ECF No. 3; Pl.'s Mem. in Support of Mot. for TRO, ECF Nos. 4-1, 31; Pl.'s Appendix, ECF Nos. 4-2, 32.
[9] Defs.' Resp. to Pl.'s Mot. for TRO, ECF Nos. 27-1, 28; Defs.' Appendix, ECF Nos. 27-2, 35.
[10] Pl.'s Reply, ECF Nos. 36-1, 38.

of proving all four elements of the requested injunctive relief. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008); *Miss. Power & Light Co.*, 760 F.2d at 621.

Upon determining that a party is entitled to injunctive relief, a court must also decide the appropriate scope of that prospective injunction. "[T]he scope of injunctive relief is dictated by the extent of the violation established[.]" *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And because it is considered an extraordinary remedy, an injunction or TRO "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff[]." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 756 (1994) (cleaned up). Thus, an injunction or TRO must "redress the plaintiff's particular injury," and no more. *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) (citation omitted).

### III.   ANALYSIS

The Court concludes that Lockheed has carried its burden at this stage of demonstrating entitlement to a TRO.

#### A.  Substantial Likelihood of Success on the Merits[11]

To show a substantial likelihood of success on the merits, a plaintiff need not demonstrate that it is entitled to summary judgment on its claim but must instead present a prima facie case. *Daniels Health Servs.*, 710 F.3d at 582. "'When the other factors weigh strongly in favor of an injunction, 'a showing of some likelihood of success on the merits will justify temporary injunctive relief.'" *Peters*, 2020 WL 13526735, at *2 (citing *Monumental Task Committee, Inc. v. Foxx*, 157 F. Supp. 3d 573, 585 (E.D. La. 2016)). Lockheed has met its burden at this stage to show that it is

---

[11] The Court only addresses Lockheed's likelihood of success on the merits of its breach of contract claim and does not address the alternative claim that Howmet breached the DPAS regulations for the compelling reasons outlined in Howmet's response. *See* Defs.' Resp. to Pl.'s Mot. for TRO 3–4, 19–20, ECF No. 28. However, Lockheed may further address the alleged breach of the DPAS regulations at the upcoming preliminary injunction hearing as a separate ground for allowing the injunction to remain in place.

likely to succeed on the merits of the breach of contract claim. Therefore, Lockheed has satisfied "arguably the most important" of the four factors. *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005).

Lockheed argues that Howmet breached the Right to Buy Clause in the MPO.[12] "Under Texas law, the elements of a breach-of-contract claim are: (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff; (3) breach by the defendant, and (4) damages sustained as a result." *CyberX Grp., LLC v. Pearson*, No. No. 3:20-cv-2501-B, 2021 WL 1966813, at *4 (N.D. Tex. May 17, 2021) (internal quotation marks omitted).[13] All four elements are met here.

Lockheed easily satisfies three of the four elements. First, there appears to be no dispute that a valid contract exists. The parties have mutually performed and benefitted from the MPO for many years. And neither side puts validity at issue. Second, Lockheed and its Qualified Suppliers appear to have complied with their obligations under the MPO's Right to Buy Clause. At no point does Howmet contend payments for titanium were not received—the performance required of Lockheed and the Qualified Suppliers. Instead, Howmet's grievance is that a fair-market price adjustment beyond the MPO's pricing levels is warranted. And while Howmet points to the alleged failures of Lockheed and the Qualified Suppliers to provide revert throughout the life of the MPO, these allegations do not change the core facts regarding Lockheed's performance, particular since Howmet only appears to take issue with these failures *now*. Howmet also has not demonstrated that these failures are material breaches by Lockheed. Third, Lockheed will likely suffer damages

---

[12] Pl.'s Mem. in Support of Mot. for TRO 6, ECF No. 31.

[13] Texas law governs this breach of contract dispute. The Right to Buy Clause incorporates by reference the January 7, 2023 General Provisions Agreement, which provides that disputes arising under the contract will be governed by "the laws of the State from which this contract is used by Lockheed Martin." Pl.'s App'x in Support of Pl.'s Mot. for TRO 034, ECF No. 32 (January 7, 2013 General Provisions Agreement). Lockheed issued the contract from its Aerospace division in Texas.

as a result of Howmet's breach of the Right to Buy Clause. These damages include delays to the production of F-35s or the payment of prices beyond the negotiated rate in order to prevent those delays. And, as discussed in the next section, Lockheed will also suffer irreparable harm that cannot be remedied by monetary damages absent a TRO. Therefore, the crux of the success on the merits inquiry, then centers on the breach element.

The evidence at this stage reveals that Howmet likely breached the MPO. The Right to Buy Clause provides that Lockheed's or its Qualified Suppliers who "provid[e] supplies . . . in connection with the prime contract(s) . . . may desire to procure a quantity of" titanium.[14] When that happens, the Right to Buy Clause between Lockheed and Howmet requires the sale of titanium to any Qualified Supplier "such commercially reasonable quantities" of titanium as is requested via purchase orders.[15] "[T]he price" for each sale "shall be the price set forth" in the Right to Buy Clause.[16] Critically, the parties' agreement explicitly states that "in no event shall a higher price for the items be charged" to any Qualified Supplier.[17] And even if Howmet takes issue with this contractual obligation, Howmet does *not* have the right to terminate the arrangement in the Right to Buy Clause—only Lockheed retains that right under specified circumstances.[18]

Howmet breached the MPO in two ways. First, Howmet exceeded the Right to Buy Clause's fixed price ceiling. Howmet sent letters informing the Qualified Suppliers that it would be "implementing a new price that applies to all new and previously acknowledged titanium orders starting on November 10th, 2023."[19] Second, Howmet failed to make a scheduled delivery to at

---

[14] Pl.'s Mem. in Support of Mot. for TRO 6–7, ECF No. 31.
[15] *Id.* at 7.
[16] *Id.*
[17] *Id.*
[18] *See* Pl.'s App'x in Support of Pl.'s Mot. for TRO 045, ECF No. 32 (Termination for Convenience Clause).
[19] Pl.'s Mem. in Support of Mot. for TRO 8, ECF No. 31.

least one Qualified Supplier under a purchase order issued pursuant to the MPO.[20] Because BAE Systems did not agree to the price increase in excess of the Right to Buy Clause, Howmet refused to resume titanium deliveries and threatened to cancel all outstanding purchase orders.[21]

Howmet raises three arguments in response. First, Howmet argues that Lockheed lacks standing to seek specific performance of any purchase order.[22] According to Howmet, "Lockheed does not have any open purchase orders to Howmet"[23] and "Lockheed is not a party to the Qualified Supplier purchase orders."[24] As a result, Howmet contends that Lockheed does "not have standing to enforce . . . contracts to which it is not a party."[25] But this argument is at odds with the plain language of the Right to Buy Clause. That agreement unambiguously states that Howmet agreed it "shall sell" the Qualified Suppliers the specified titanium materials at the "price set forth in [the Right to Buy Clause]." Notwithstanding any contrary terms in the purchase orders with the Qualified Suppliers, Howmet still violates its contractual obligation to Lockheed by failing to sell commercially reasonable quantities of titanium at the specified price to Lockheed's suppliers. Lockheed seeks specific performance of the Right to Buy Clause in its *own* contract with Howmet. Lockheed does not appear to be seeking specific performance of any other contract terms entered beyond the scope of the MPO. For this reason, the Court determines Lockheed has standing.

Second, Howmet contends that the MPO directs it to "contract with Qualified Suppliers separately" because Lockheed "bargained to avoid being a party to such purchase orders."[26] As part of that bargain, Howmet argues that "the terms and conditions of the purchase orders between

---

[20] *Id.*
[21] *Id.* at 3–4, 8.
[22] Defs.' Resp. to Pl.'s Mot. for TRO 20–23, ECF No. 28.
[23] *Id.* at 20.
[24] *Id.* at 21.
[25] *Id.*
[26] *Id.*

8

Howmet and Qualified Suppliers will be separate from, and may not be the same as, the terms and conditions of the MPO with Lockheed."[27] Be that as it may, the specific Right to Buy Clause of the MPO controls any subsequent purchase orders with Lockheed's Qualified Suppliers. Terms that deviate from this fixed price likely constitute a breach of the MPO. That the MPO directs Howmet to enter subsequent purchase orders with Qualified Suppliers cannot be construed as undermining the Right to Buy Clause. Doing so would fail to construe the MPO in its entirety and harmonize all of its terms. *Smart v. Tower Land & Investment Co.*, 597 S.W. 2d 333, 337 (Tex. 1980); *see also Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–34 (Tex. 1994) ("This court is bound to read all parts of a contract together to ascertain the agreement of the parties."). Such construction would also violate the well-established rule that specific terms govern over general terms. *Forbau*, 876 S.W.2d at 133–34 (citing 3 ARTHUR L. CORBIN, CONTRACTS §§ 545–54 (1960)); *see also Wells Fargo Bank, Minn., N.A. v. N. Cent. Plaza I, L.L.P.*, 194 S.W. 3d 723, 726 (Tex. App.—Dallas 2006, pet. denied) (explaining that courts resolve conflicts in contract provisions by construing specific provisions as controlling over general provisions). Harmonizing the terms of the MPO and giving particular effect to specific terms, the MPO's direction for Howmet to enter into individual purchase orders with Qualified Suppliers—and not directly with Lockheed—does not mean those separate contracts override the Right to Buy Clause.

Third, Howmet points to certain excuses for its breach, such as impracticability[28] and Lockheed's own breach of the MPO.[29] Beginning with impracticability, Howmet is a sophisticated

---

[27] *Id.*
[28] Howmet seems to link its impracticability excuse with the MPO's "commercial reasonability" language. *See id.* at 22–23, ECF No. 28. Lockheed also appears to understand Howmet's argument in this way. *See* Pl.'s Reply 6, ECF No. 38. For purposes of this Order and because Howmet merely asserts these defenses without fleshing them out at this stage of the proceedings, the Court addresses both arguments together when it refers to impracticability.
[29] Defs.' Resp. to Pl.'s Mot. for TRO 22, ECF No. 28. Howmet also raises failure to mitigate as an excuse to performance. *Id.* at 22–23. However, this defense appears intertwined, in part, with Lockheed's DPAS

party who negotiated for, and agreed to, the Right to Buy Clause. For performance of a bargained-for term to be excused as impractical, the non-performing party must show that (1) a supervening event occurred and (2) its non-occurrence was a basic assumption of the contract. *Samson Exploration, LLC v. T.S. Reed Props., Inc.*, 521 S.W. 3d 766, 775 (Tex. 2017) (citing RESTATEMENT (SECOND) OF CONTRACTS § 261). One example of a supervening event is an unforeseen government regulation that makes performance illegal. *See Centex Corp. v. Dalton*, 840 S.W.2d 952, 954 (Tex. 1992). In contrast, "a contractual obligation cannot be avoided" as impractical "simply because performance has become more economically burdensome than a party anticipated." *TEC Olmos, LLC v. ConocoPhillips Co.*, 555 S.W.3d 176, 183 (Tex. App.—Houston [1st Dist.] May 31, 2018) (internal quotation marks omitted). Thus, the Court cannot conclude at this stage that the war in Ukraine was a supervening event.

Even if Russia's invasion of Ukraine qualifies as a supervening event, Howmet has not shown how the non-occurrence of that invasion was a basic assumption of the Right to Buy Clause. Simply pointing to minimal price volatility prior to 2022 is not enough.[30] When the parties agreed in 2018 to fixed pricing, even the casual consumer of news would have been aware of the nascent potential for Russia to invade Ukraine.[31] Russia annexed Crimea in 2014 and fighting in the

---

allegations. For this reason, the Court does not address this potential defense. Howmet may reassert this argument at the upcoming preliminary injunction hearing. To the extent Howmet's failure to mitigate defense solely concerns Lockheed's potential obligation to purchase from other suppliers, the Court determines at this stage that the invocation of this defense is insufficient to overcome Lockheed's likelihood of success on the merits regarding the *specific performance* it seeks under the MPO.

[30] Defs.' Resp. to Pl.'s Mot. for TRO 5–6, ECF No. 28.

[31] *E.g.*, *Ukraine fears Russia will use exercises next week to invade*, BBC (Sept. 7, 2017), https://www.bbc.com/news/world-europe-41190967; *The Moral Case for Sanctions Against Russia*, THE NEW YORKER (Apr. 6, 2018), https://www.newyorker.com/news/our-columnists/the-moral-case-for-sanctions-against-russia; *Moscow's Maritime Threats to Ukraine and the West*, ATLANTIC COUNCIL (May 1, 2018), https://www.atlanticcouncil.org/blogs/ukrainealert/moscow-s-maritime-threats-to-ukraine-and-the-west/; *Ukraine president warns Russia tensions could lead to 'full-scale war'*, THE GUARDIAN (Nov. 27, 2018), https://www.theguardian.com/world/2018/nov/27/russia-to-charge-ukrainian-sailors-as-kerch-crisis-deepens; *Is Russia About to Invade Ukraine?*, ATLANTIC COUNCIL (Dec. 13, 2018), https://www.atlanticcouncil.org/blogs/ukrainealert/is-russia-about-to-invade-ukraine/; *Russia-Ukraine*

Donbas region has continued since then, making it one of the bloodiest conflicts in Europe since the Balkan Wars.[32] Combined with Howmet's acknowledgement that both Russia and Ukraine "were previously major sources of titanium supply for Western markets,"[33] the Court at this stage cannot conclude that the parties assumed the non-occurrence of instability in a region with such a volatile history. To the contrary, it seems that the potential for conflict in this region—and the subsequent impact on the price of titanium—was reasonably foreseeable.

As to Howmet's argument that it is excused due to Lockheed's breach of the MPO for failing—alongside its Qualified Suppliers—to provide revert, Howmet appears to raise this issue for the first time *after* experiencing titanium supply issues despite suggesting that the breaches date further back.[34] But even if Howmet raised this concern prior to the present pricing dispute, Howmet's performance would only be excused if the failure to provide revert is significant enough to qualify as a material breach. *See Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994) ("A fundamental principle of contract law is that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform."). The Court lacks evidence at this stage to assess whether any failure to provide revert constitutes a material breach. Accordingly, Howmet's assertion of this affirmative defense at this stage does not overcome Lockheed's demonstration that it is substantially likely to succeed on the

---

*War: Moscow Could Launch Armed Attack Over Christmas While the World is Distracted, Experts Warn*, NEWSWEEK (Dec. 24, 2018), https://www.newsweek.com/ukraine-russia-war-attack-christmas-1270621.
[32] *Ukraine: Conflict at the Crossroads of Europe and Russia*, COUNCIL ON FOREIGN RELATIONS (Feb. 14, 2023), https://www.cfr.org/backgrounder/ukraine-conflict-crossroads-europe-and-russia.
[33] Defs.' Resp. to Pl.'s Mot. for TRO 7, ECF No. 28.
[34] *See* Defs.' Resp. to Pl.'s Mot. for TRO 3, ECF No. 28 ("Since at least mid-2022, Howmet has continually kept Lockheed apprised of severe titanium supply issues . . . *and* the failure of Lockheed and Qualified Suppliers to return scrap 'revert' as they were contractually required to do." (emphasis added)); *see id.* at 6 ("[D]espite repeated pleas from Howmet, neither Lockheed nor its Qualified Suppliers made *any* revert available to Howmet."). The Court does not opine on the possibility of Howmet's waiver or ratification given the presence of a non-waiver provision in the MPO. *See* Pl.'s App'x in Support of Pl.'s Mot. for TRO 046, ECF No. 32 (Waivers, Approvals, and Remedies Clause).

11

merits of its breach of contract claim.[35]

Having established all four elements of its breach of contract claim at this stage, the Court determines that Lockheed has carried its burden regarding likelihood of success on the merits. Despite alleging in response that Lockheed also breached the MPO by failing to supply revert, Howmet has not shown how this potential breach excuses its own performance—particularly in light of the provision that it "shall diligently proceed with the performance of this Contract . . . until resolution of any dispute hereunder."[36] In other words, even if the Court instead found that Lockheed was not substantially likely to succeed regarding the Right to Buy Clause, at a minimum it is substantially likely to succeed on the continued performance clause. Thus, this factor weighs in favor of granting a TRO.

### B. Substantial Threat of Irreparable Harm

In the Fifth Circuit, it is "well-established" that a harm is considered "irreparable only 'if it cannot be undone through monetary remedies.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir.1984)). The Court may issue injunctive relief "to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 627 (5th Cir. 1985).

Plaintiff argues that it will suffer irreparable harm in three ways if Howmet's breaches are allowed to continue: (1) threaten national security by delaying Lockheed's critical F-35 program,[37] (2) damage Lockheed's reputation and goodwill,[38] and (3) lose a bargained-for right to demand

---

[35] Arguments regarding whether the failure to return revert constitutes a material breach—and thus excuses Howmet's performance—may be asserted at the preliminary injunction hearing.
[36] Pl.'s App'x in Support of Pl.'s Mot. for TRO 038, ECF No. 32 (Disputes Clause).
[37] Pl.'s Mem. in Support of Mot. for TRO 10–14, ECF No. 31.
[38] *Id.*

continued performance of the contract during a dispute.[39] Based on the evidence presented at this stage, the Court finds that the first two alleged harms are not irreparable. Howmet's response sufficiently addresses why these identified harms fall short based on the evidence currently before the Court—largely because the harms can be avoided without injunctive relief and remedied in the future with monetary damages.[40] However, the Court determines that the third harm qualifies as the sort that cannot be undone through monetary remedies: the loss of a bargained-for right.

The parties agreed in advance how disputes would be handled. Under the MPO, Howmet agreed to continue to "diligently perform . . . at Lockheed's demand" while a dispute is pending.[41] Lockheed argues that if Howmet is permitted to perform in a way other than what the MPO requires—receiving higher prices as a condition for supplying materials and perhaps even withholding supply in the event higher prices are not paid—Lockheed will irreparably lose its bargained-for right to demand continued performance during a dispute.[42] In the Fifth Circuit, an injunction is appropriate when the contract specifically contemplates the status quo continuing during the parties' dispute. *See RGI, Inc. v. Tucker & Assocs., Inc.*, 858 F.2d 227, 230 (5th Cir. 1988) (affirming the preliminary injunction because the "bargained-for provision clearly contemplates that the status quo is to continue pending arbitration"). The operative principle is relevant here: it is appropriate for a district court to grant an injunction to preserve the status quo

---

[39] Pl.'s Reply 2–3, 10, ECF No. 38.
[40] *See* Defs.' Resp. to Pl.'s Mot. for TRO 16–19, ECF No. 28. Howmet's asserts that it will continue to provide titanium rather than withhold it. If it were fully withholding, the situation would be comparable to *i3 Microsystems, Inc. v. Charles Stark Draper Laboratory, Inc.*, 2022 WL 18927172 (M.D. Fla. Nov. 17, 2022). Instead, by continuing to supply titanium—even at higher prices—Lockheed (and its suppliers) will still receive titanium and can avoid delays in the production of F-35s—this falls short of irreparability. There is no evidence in the record at this stage to suggest that Lockheed cannot afford to cover the increased costs while the parties litigate their dispute. The only potential harm that remains is the additional cost Lockheed must pay now to avoid delays, for which Lockheed may remedy at the merits stage of this litigation. Crucially, the evidence at this stage shows that these additional costs are not so prohibitive as to impair production of F-35s.
[41] Pl.'s App'x in Support of Pl.'s Mot. for TRO 038, ECF No. 32 (Disputes Clause).
[42] Pl.'s Reply 10, ECF No. 38.

while the dispute is pending by protecting a specifically bargained-for right in the contract. *Id.*

Other courts have recognized this irreparable harm in the surety context. *See Hartford Fire Ins. Co. v. 3i Constr., LLC*, No. 3:16-cv-00992-M, 2017 WL 3209522, at *4 (N.D. Tex. May 18, 2017) ("Merely awarding money damages post-judgment would deny [the surety] its contractual right to immediate payment of collateral, and accordingly, [the surety] would forever lose its right to immediate exoneration and would be irreparably injured. (cleaned up)). In *Hartford Fire*, granting the injunction prevented the surety from forever losing the bargained-for right. *Id.* (explaining that "[t]his is not simply an issue of a possible monetary loss, but rather is an issue of impairing a surety's expectation and requiring it to suffer any loss, even if only temporary, associated with the performance of a primary obligor's duty"). The same is true here.

Without a TRO, Lockheed will suffer irreparable harm from the loss of a bargained-for right: that Howmet will diligently perform while the parties resolve their dispute. Even if it is true that the monetary harm to Lockheed is only temporary, the MPO nonetheless memorializes the parties' bargain that Lockheed will be immune from such harm while the dispute is pending. Accordingly, the Court concludes that, at this stage, the irreparable harm factor also weighs in favor of granting a TRO.

### C. Balance of Hardships

The third factor the Court must consider is the balance of hardships. *Nken v. Holder*, 556 U.S. 418, 435 (2009). A court must weigh any purported injuries the enjoined parties may experience against the strong likelihood that they will not succeed on the merits. *See Freedom From Religion Found., Inc. v. Mack*, 4 F.4th 306, 316 (5th Cir. 2021) (explaining that "any injury to [the enjoined party] is outweighed by [a] strong likelihood of success on the merits" by the requesting party).

Both parties offer interests that the Court now weighs. On one side, Lockheed asserts interests of national security, reputation and goodwill, and compliance with explicit bargained-for rights.[43] Although Lockheed did not provide sufficient evidence at this stage to show how its reputation and goodwill, along with national security, would be *irreparably* harmed, it nonetheless provided some evidence of harm to these interests.[44] For instance, delays (even if in addition to unrelated delays caused by Lockheed itself) still constitutes a harm that the Court must weigh. It is certainly conceivable that any delays in delivering F-35 aircrafts to military forces could threaten national security interests to some extent. Likewise, the potential impact on Lockheed's reputation and goodwill with existing customers (namely the United States), as well as new customers given the recent increased demand for F-35s, is also a harm to consider.[45] And, most importantly, Lockheed's bargained-for right of Howmet's continued performance would be irreparably harmed without a TRO. Combined with these injuries Lockheed is already experiencing—and will continue to experience—without a TRO, the equities strongly favor Lockheed. This is particularly true given that the Court already has determined that Lockheed is substantially likely to succeed on the merits of its breach of contract claim, which the Court must heavily consider when balancing the equities. *See Mack*, 4 F.4th at 316.

On the other side, Howmet points to the comparative financial states of each party. According to Howmet, Lockheed expects increased profits due to increased demand for F-35s at the same time Howmet is absorbing millions of dollars in cost increases.[46] As a result, Howmet contends that continuing to supply titanium under the current pricing regime is unsustainable.[47]

---

[43] Pl.'s Mem. in Support of Mot. for TRO 10–14, ECF No. 31; Pl.'s Reply 2–3, 10, ECF No. 38.
[44] *Id.* at 10–14.
[45] Defs.' Resp. to Pl.'s Mot. for TRO 7, ECF No. 28
[46] *Id.* at 24–25.
[47] *Id.* at 25.

The Court does not question the sincerity of Howmet's concerns. Even so, granting a TRO does no more than "simply . . . require[] [Howmet] to comply with their contractual obligations." *Emery v. Sun Cupid Technology (HK) Ltd.*, No. No. 3:20-cv-3519-L, 2020 WL 10181571, at *2 (N.D. Tex. Dec. 1, 2020). That is not a hardship that weighs heavily on the equitable scale. Even if such compliance is costly and undesirable, there is no dispute that Howmet negotiated for, and agreed to, these particular contract terms. And "a contractual obligation cannot be avoided simply because performance has become more economically burdensome than a party anticipated." *TEC Olmos*, 555 S.W.3d at 183. Moreover, even if Howmet ultimately prevails on the merits of this contract dispute, it nonetheless agreed to continue performance consistent with the contract while any dispute is pending. Howmet has not pointed to a comparable bargained-for right that will be lost by issuance of a TRO. Therefore, the balance of the hardships tips in favor of granting the TRO.

### D. Public Interest

The final factor the Court must consider is whether the TRO serves the public interest. *Nken*, 556 U.S. at 435. A court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

Lockheed argues that the public interest is always served by holding parties to their contractual obligations.[48] In other words, "[t]he public interest will also be served by ensuring [Howmet's] performance under the parties' contractual agreements, as the public expects parties to honor their contractual obligations." *Emery*, 2020 WL 10181571, at *2. Additionally, protecting national security is in the public interest, which is paramount among public interest considerations. *Cf. Rosa v. McAleenan*, 583 F. Supp. 3d 850, 886 (S.D. Tex. 2019) ("While the protection of

---

[48] Pl.'s Mem. in Support of Mot. for TRO 14–15, ECF No. 31.

constitutional rights are ordinarily the highest public interest at issue in a case, matters such as national security and national defense can outweigh a movant's constitutional rights." (internal quotation marks omitted)). Howmet does not appear to dispute these public interests. Instead, Howmet's reasons why the Court should not issue a TRO are related entirely to the harms Howmet will experience. Finding nothing in the record at this stage to show the public will be harmed, the Court determines that issuance of a TRO here would not disserve the public interest.

## IV. SCOPE OF RELIEF

Having determined that Plaintiff carried its burden showing that a temporary equitable remedy is warranted in this situation, the Court must next decide how to provide complete relief. When granting an injunction, the Court is obligated to state "specifically" and "in reasonable detail . . . the act or acts restrained or required" under the injunction. FED. R. CIV. P. 65(d)(1)(b)–(c). In keeping with that obligation, the Court tailors the scope of this TRO with careful attention to avoid upsetting the balance of the competing interests. Accordingly, the Court temporarily **ORDERS** Defendants, along with their officers, agents, servants, and employees, to immediately comply with all terms of the MPO. Specifically, the Court **ORDERS** the following performance:

1. Fulfill all outstanding purchase orders issued by Plaintiff—or Qualified Suppliers related to Plaintiff's production of F-35s—at the prices previously negotiated and agreed by Plaintiff and Defendants, including any outstanding purchase orders that Defendants declined to fulfill.

2. Fulfill any future purchase orders issued by Plaintiff—or Qualified Suppliers related to Plaintiff's production of F-35s—during the life of this TRO at the prices previously negotiated and agreed by Plaintiff and Defendants, unless Defendants have some legal basis for non-performance.

Rule 65 requires the posting of a surety bond. Accordingly, the Court **ORDERS** the parties to submit supplemental briefing on this issue **no later than December 19, 2023**.

This relief should alleviate Plaintiff's demonstrable injuries without unnecessarily burdening Defendants. Crucially, this temporary relief only remains in effect for fourteen days—until 11:59 p.m. on December 26, 2023. After the preliminary injunction hearing, the Court will decide whether this relief should continue beyond the fourteen-day period. FED. R. CIV. P. 65(b)(2)–(3).

## V.    CONCLUSION

For these reasons, the Court **GRANTS** Plaintiff's request for a TRO (ECF No. 3). The Court sets this matter for hearing on **December 26, 2023 at 9:00 a.m**. At such time, the Court will determinate whether or not this TRO should continue during the life of this lawsuit. An order with instructions for the preliminary injunction hearing will issue separately.

**SO ORDERED** on this **12th day** of **December, 2023**.

_____
Reed O'Connor
UNITED STATES DISTRICT JUDGE